### ANDERSON & YOUNG *v.* THE CAPE FEAR STEAMBOAT COMPANY.

In a case where there are a number of witnesses on each side who contradict each other, it would be improper (generally,) for the Court to select one of them, and instruct the jury that *if they believed him*, they must find their verdict in a particular way, because, among other reasons, that would be to make the case turn upon his veracity, whereas he might be truthful, and yet, his testimony be liable to modification, or explanation by other parts of the testimony.

Where fire was communicated to a barn by sparks from a Steamboat, and the boat was provided with an effectual " spark-extinguisher" which was not at the time in use : *Held*, that the fire was caused by *negligence* upon the part of the Steamboat.

CASE, tried before *Russell, J.*, at December Special Term 1869, of NEW HANOVER Court.

The plaintiffs sought to recover damages from the defendant for the negligence of its servants in managing the Steamboat, " Gov. Worth," whereby the barn of the plaintiffs, and the machinery therein were destroyed by fire communicated by sparks from the smoke-stack of said Steamboat, while navigating the Cape Fear River in April, 1867.

Several witnesses were examined for both plaintiffs and defendant. Among the witnesses for the defendant, was A. P. Hurt, the Captain of the Steamboat, at the time of the alleged injury, who testified that he had been a steamboat Captain for 20 years, and was familiar with the navigation of the Cape Fear River; that he had command of the "Gov. Worth" on the day the barn was burned; that when he left the wharf at Wilmington, a strong wind was blowing from a direction East of South, and the Steamboat, when loosed from the wharf, was carried by the wind out in the river without using her paddles; that she left the wharf about 2 o'clock in the afternoon; that the plaintiffs' barn was on the East side of the river, about 3½ miles from Wilmington; that there was a long reach in the river, up which the Steamer went towards the barn, and that said reach was parallel with the course of the river at Wilmington, and that the wind was carrying the sparks diagonally across the river, and not towards the barn; that there was a sharp bend of the river at that point where the barn was located, (the barn being on the " cove side,") and that the river was 150 yards wide at that point; that in going up, the Steamer hugged the shore opposite the barn so closely as to attract the observation of a passenger, and that she was about 150 yards from the barn while passing; that the Steamer was going at her usual rate of speed with the usual amount of fire and steam; that she threw fewer sparks than any Steamer on the river, and had the highest smoke-stack on the river; that he never knew sparks to fly from her smoke-stack further than 20 or 30 yards, and that she was the safest boat on the river; that about 200 yards before reaching the barn he passed the Steamboat " Gen. Howard" coming down the river on the side next the barn, and that the wind was blowing hard at that time.

Capt. Hurt further testified, in answer to the cross-exami-

nation of plaintiff's counsel, that he used no spark-arrester at that time, because he had tried various experiments with spark-arresters of a half dozen kinds and found them impracticable, as they would choke up the smoke-stack and get knocked off by limbs and trees on the river banks, and that he had found that using a smoke-stack 40 feet high, as he did on the "Gov. Worth" was the best means of preventing the emission of sparks.

He stated that he had on the boat, connected with the boiler and smoke-stack, an appliance that he sometimes used to avoid the danger of setting fire to buildings by sparks, which on the examination, was termed a "spark extinguisher;" he said that on coming into the City of Wilmington, he always used this arrangement, and that he sometimes used it by partially putting it on when passing buildings on the river bank. In answer to a question by plaintiff's counsel, he stated that he did not know that it was used at all in passing the barn in question. In answer to a question by defendant, he said that he could use this appliance without difficulty when coming into the City, because he always had on a good head of steam and the boat could be got up to the wharf easily, but that he could not keep it on for any considerable length of time without very seriously interfering with the progress of the boat. He further said that there were many buildings on the river bank between Wilmington and Fayetteville, and that he thought if he put the extinguisher on every time he passed a building it would take two days to make the trip insted of one as at present.

*John C. Bailey,* a witness for the defendant, testified that the Steamer "Gov. Worth," on the occasion in question had a contrivance for arresting sparks which was a part of her machinery, (the appliance spoken of by Capt Hurt as a "spark extinguisher") and by means of which sparks could be arrested by turning the "exhaust" into the smoke-stack,

that it was a good contrivance for that purpose but could not be used for any great length of time without stopping the boat, and that it could be used as much as twenty minutes at a time without materially interfering with the progress of the boat.

A. D. Young, one of the plaintiffs, testified that the barn had been standing by the side of the river where it was when burned, for 17 years; that on the day when it was burned he went from town to the plantation where the barn was, in a boat; that in going up the river he met the Steamer, "Gen. Howard" which had passed the barn on its way to town, and at the points of meeting was 1¼ miles below the barn; that about a half hour after meeting said Steamer he went to the barn and went over it and saw no fire anywhere near it, and that there was no fire in the fields and none anywhere nearer than the dwelling house which was a half a mile distant; that he left the barn and about ten minutes afterwards the Steamer, "Gov. Worth" passed the barn on its way up the river, and in a very few minutes after it passed he saw the barn burning; that everything was very dry at the time, that the wind had been blowing very hard for four or five hours; that it was a little West of South, and in a direction to carry sparks from a Steamer going up the river directly towards the barn.

Daniel Stevenson, witness for the plaintiffs, testified that he was fishing on the other side of the river nearly opposite the barn, that he saw the Steamer, "Gov. Worth," and it passed within fifty yards of the barn; that the wind was blowing very hard, that a great quantity of very large sparks was flying from the smoke-stack of the Steamer directly towards the barn; that he saw the sparks blown to the barn, and upon it, and in a very little while he saw the barn in a blaze, and that the wind was blowing from a little West of South.

Richard Meares, witness for the plaintiffs, testified that he was on the same side of the river with the barn, and about 300 yards from it ; that he saw the Steamer, " Gov. Worth" coming up the river ; that the wind was blowing hard and blew the Steamer in towards the shore and near to the barn, and that he saw the sparks fly from the smoke-stack of the Steamer upon the barn and set it on fire.

John McRae, witness for plaintiffs, testified that he had been fishing in a creek on the same side of the river with the barn and about one-fourth mile from it, and that he had spread his net on the bank to dry; that when the "Gov. Worth" turned a bend in the river about a mile above the barn, a great quantity of sparks was blown from her smoke stack into the creek where he was ; that thinking his net in danger he ran to save it and saw the sparks from the Steamer set fire to the stubble in the field which was burned off, and soon afterwards he saw the barn on fire.

Gaines, a witness for the plaintiffs, testified that at the time the plaintiff's barn was burned he was employed on the plantation of one Ivey, about a mile to the northward of the barn; that he saw the barn burning and saw sparks from it set fire to some dead trees, six or seven hundred yards distant from the barn, and nearly due North of it.

S. L. Fremont, witness for the plaintiffs, testified that he was an engineer by profession, and had been particularly familiar with the principles and use of steam engines for more than fifteen years on railroads, but was not familiar with steamboat machinery; that there is no difference in the principle in steam engines, whether used on Steamboats or railroads ; that at the time the barn was burned, and for many years before there were several kinds of spark-arresters well and generally known to persons using steam engines, which were used for preventing accidents by fire from sparks and which were effectual for that purpose, and that these

spark-arresters could be used on steamboats as well and effectually as on railroads, and that but for their use the railroads would burn up the country.

Much of the evidence on both sides was circumstantial and much of it conflicting on material points. Six witnesses were examined as to material points on the part of the plaintiffs, and seven on the part of the defendant.

There was evidence that steamboats had been running on the river for a great many years without ever setting fire to anything.

The defendant's counsel asked his Honor to charge the Jury,

1st. "That if they believed the testimony of Capt. Hurt, there was no negligence."

His Honor refused to give the instruction and defendant's counsel excepted.

2nd. "That if they believed Capt. Hurt's testimony in regard to the means used to prevent fire, there was no negligence"—which instruction was also refused, and defendant's counsel excepted.

His Honor charged the Jury that if it was true as stated by Capt. Hurt, that he was 150 yards from the barn, and not nearer, and if it was true that sparks from the smoke-stack would not fly further than 20 or 30 yards, then there was no negligence, but that the Jury must consider this testimony of Hurt, in connection with the evidence of other witnesses, some of whom positively contradicted his statements, and many of whom stated circumstances relied upon by the plaintiffs as being inconsistent with his testimony. His Honor further charged the Jury that if they believed that boats had been passing for years without setting fire to this building, and that the building had been set fire to by the "Gov. Worth," then there is a presumption of negligence, and it devolved on the defendants to show that they used

proper precautions, that they could repel it by showing that the circumstances under which the event happened were extraordinary, as for instance by a violent gale of wind; that if the wind was blowing when the boat passed the barn, and if there was any appliance known to steamboat men which would arrest the sparks, then the defendants were bound to use it unless the use of it would break up their business, or in other words, be impracticable.

In commenting upon the case of *Herring* v. *W. & W. R. R.*, to the Jury, his Honor said, "in that case it was a human being that was on the track with the instinct of self preservation, and it was presumed he would get off the track, if it had been a log of wood it would have been negligence, and in this case it was a house standing on the river bank which the defendants were bound to see, and it was their duty to take all reasonable and proper precaution in passing it."

To the charge as above given and the comments on the case of *Herring* v. *W. & W. R. R.*, the defendant's counsel excepted.

Verdict for plaintiffs for $5,000; Rule for new trial; Rule discharged; Judgment and appeal.

*Strange*, for the appellants.
*Bragg*, contra.

1. The Judge properly refused the instructions 1st and 2nd, prayed by defendants. *Gaither* v. *Ferebee*, 1 Wins. 310; *State* v. *Norton*, Ib. 303; *State* v. *Summey*, 2 Ib. 108.

2. As to negligence, the charge was correct. *Ellis* v. *Ports. R. R. Co.*, 2 Ire. 138; *Garris* v. *Same*, Ib. 324; *Herring* v. *Wil. & Ral. R. R. Co.*, 10 Ib. 402; *Avent* v. *Murrel*, 4 Jon. 323; *Aycock* v. *R. R. Co.*, 6 Id. 231

*Hayett* v. *Phil. & Read. R. R.*, 23 Pa. 373; 20 Ib. 177; 1 Denio, 91; 1 Red. on R. R., 452.

3. Upon the evidence, there was negligence, and even if the charge were wrong, the verdict was right, and cures the error of the Judge. *Chaffin* v. *Lawrence*, 5 Jon. 179, and cases cited.

READE, J. The facts being ascertained, negligence is a question for the court. When the testimony is all on one side, or is not contradictory, the Court can decide whether there is, or is not, negligence. When the testimony is on both sides and contradictory, the Court must submit the testimony to the jury to find the facts and apply the law, as the Court shall explain it, as to what constitutes negligence in the particular case. Here there were six witnesses for the plaintiffs, and seven for the defendant, and their statements were conflicting. The defendant selected the testimony of one of his witnesses, and asked his Honor to charge the jury, that "if they believed the testimony of Captain Hurt, there was no negligence." The testimony of this witness was by no means the most consistent and satisfactory, and was expressly contradicted by others. Such a charge under the circumstances would have been calculated to mislead the jury, and induce them to believe that the case depended upon the truthfulness of the witness, and that a verdict against it would be an imputation of perjury. This would be a trial of the *witness* rather than of the *case ;* whereas both the witness and his testimony might be in the main truthful, and yet so explained or modified by the other testimony as to authorize a verdict against it. If his Honor had passed upon the testimony to ascertain the facts, he would have considered the whole, and he could not do less than submit the whole to the jury, when he substituted them to find the facts for him. His Honor did charge the

jury that if they believed the most important part of Capt. Hurt's testimony, *i. e.* "that the steamboat was one hundred and fifty yards from the barn, and that the sparks did not fly more than twenty or thirty yards from the boat," then there was no negligence. This is self-evident, and the defendant had the benefit of it. Take out this portion of his testimony, and there is nothing left which shows ordinary care on the part of the boat: on the contrary it makes out a clear case of negligence, upon the supposition that the barn was burned by the boat, as was clearly testified to by the other witnesses; for Capt. Hurt states that he had no "spark-arrester" on at the time, and that there was a strong wind. The testimony in detail is sent up with the case, and taken as a whole, the jury were well authorized to find that as the boat went up the river there was a strong wind which blew the sparks from the steamboat upon the barn, and burned it down, that there was no "spark-arrester" used, and that there are spark-arresters in general use on steamboats and railroads, which are effectual for the purpose, that the boat had a "spark-extinguisher" which was sometimes used and was effectual when used, and could be put off and on at pleasure, and it was not used on this occasion. These facts make a clear case of negligence.

The reason given for not using the spark-arrester constantly on this boat was, that it choked the smoke-stack and impeded the speed of the boat. If that be true, still it is an inconvenience which must be submitted to in favor of life and property; and it is an inconvenience to which other boats and railroads submit. If it were not so, then, as stated by one of the witnesses, the country would be burned up. It was stated by Capt. Hurt that as a substitute for the spark-arrester, he used a higher smoke-stack than common, which he found to be the "best means for preventing the emission of sparks." If it was the "best means," then it

was not negligence to use it instead of a spark-arrester. But this seems inconsistent with other parts of his testimony in which he states that he had upon the boat a " spark-extin-guisher," which he always used when going into Wilmington, and sometimes when passing buildings on the river. Why use it at all, if the high smoke-stack was better ? Why was it better to use it when going into Wilmington and passing other houses on the river, and not better to use it when passing this barn ? This uncertainty, not to say inconsis-tency, in the testimony of Capt. Hurt, shows clearly that his Honor could not have put the case to the jury upon it, as he was asked by the defendant to do. It seems to be uncertain, even in his own opinion, whether the high smoke-stack or the spark-extinguisher was the best means; and the fact that he used the latter in places of greatest danger, would justify the inference that he thought the spark-extinguisher the best means. If so, there was a special reason why he should have used it on this occasion ; because he was passing a barn of great value, full, probably, of combustible material, and there was a strong wind. In determining the question of negligence on any given occasion, the circumstances must be taken into consideration. What would be ordinary care in one case, would be negligence in another. Where the danger is increased, the safe-guards must be increased ; just as a bailee must take better care of a purse of gold than of an umbrella. Exception was taken to his Honor's charge, that if there was any appliance known to steamboat men that would arrest the sparks, the defendant was bound to use it." If this be construed to mean that the defendant must use all or the very best appliances, the charge would be objectional ; but such a construction would be " sticking in the bark." The plain meaning is, that the defendant was bound to use some efficient means to arrest the sparks, and thus understood, the charge is right.

The exception to his Honor's comments on the case of *Herring* v. *W. and W. R. R.*, are without force, as it seems to us. No error is specified.

If there was any error in the instructions of the Court, the finding of the jury seems to us, in view of all the evidence, to be right, and that cures the alleged error.

There is no error.

PER CURIAM.                    Judgment affirmed.