(Berm v. Allison, 68 N.C. 416; Anderson Young v. Steamboat Co.,64 N.C. 399; Jackson v. Commissioners of Greene, 76 N.C. 282; Rives v.Porter, 7 Ired., 74; S. v. Poor, 4 D. B., 384; cited and approved.)
The complaint, among other things, alleges in substance, that the plaintiff was the sheriff of Richmond County, and as such, had in his hands on 31 August, 1881, four executions, amounting in the aggregate to $693.51, issued from the Superior Court of Robeson County to the sheriff of Richmond County, in pursuance of judgments in favor of Wisenfield Co., against one J. D. Jowers, obtained before a justice of the peace in Robeson County, and duly docketed in the Superior Courts of Robeson and Richmond counties.
That on 2 September, 1881, the plaintiff levied said executions on "about 9,000 pounds of seed cotton in gin-house and crib, the property of the said J. D. Jowers, the defendant in the execution," and on *Page 231 
6 September he levied `on all the matured crop of cotton in field (287) at J. D. Jowers', in Richmond County, adjoining the lands," etc., and "that by virtue of said executions, levies and his office of sheriff of Richmond County, he took possession of said property, and became the legal owner thereof," etc., and that afterwards the defendants wrongfully converted to their own use, about 7,500 pounds of said seed cotton, and about 2,500 pounds of the matured crop in the field.
All the allegations of the complaint are denied by the defendants.
The plaintiff offered in evidence duly certified transcripts of the judgments, executions and levies.
John Leach, witness for the plaintiff, testified as follows: "I was living at Shoe Heel in 1881; was merchandising, the firm being McLean 
Leach. The deputy sheriff (Morrison) went to Jowers' place and levied upon cotton; we shipped the cotton to Hall Pearsall (defendants), at least a portion of it — most of it to them; cotton was then worth 9 cents a pound, lint — seed cotton worth 3 cents a pound. To the best of my recollection, we shipped it all to them — 45 or 46 bales. It was in the seed when we got it, and we ginned and shipped it to Hall Pearsall. This includes the growing matured crop. I don't say they received all, but the bulk of the 9,000 pounds in the gin-house. We took the cotton because it belonged to us. We made advances to Jowers, and took three liens to secure us. We advanced $1,100 or $1,200 worth up to 2 September, 1881. Jowers' farm was one and one-half miles from Shoe Heel in Richmond and Robeson counties. Morrison came to Shoe Heel 2 September, 1881. I saw him before he went to the farm; he said he came to levy upon the growing crop, but he did not think it was right, and he didn't think he had a right to levy; that he would wait until he saw Mr. Shaw, who was then in New York. I saw Jowers before Morrison went out to the farm, and he turned over the crop to us; after that, we had control of the crop. I don't know that Morrison (288) went over the crop. Jowers never had any control over the crop after he turned it over to us. I found 5,000 or 6,000 pounds in gin-house and crib on Jowers' place, and carried it off three of four days afterwards from the gin-house. Morrison came to Shoe Heel two or three days afterwards. We found no one in charge of the cotton when we took it. I can't say as to shipping the identical cotton in gin-house to Hall Pearsall. The little crib looked as if it had been nailed and broken open. I can't say as to the gin-house. After we got the cotton, we ginned and shipped it to Hall Pearsall in a few days, according to my best impression."
D. M. Morrison, witness for plaintiff, testified: "In 1881 I was deputy sheriff of Richmond County, and Z. F. Long was the sheriff; had the executions in my hands against Jowers — four of them; went to Jowers' *Page 232 
place and levied on the seed cotton in the gin-house, and some I put in the crib; nailed one door of gin and locked the other, and fixed floor the best I could, and locked the crib. There were about 9,000 pounds seed cotton — didn't weigh it — about 100 pounds in the crib; found cotton in gin-house on Jowers' place; levied on it in gin-house on 2 September, 1881, and levied on growing crop on the 4th or 5th after; had no conversation with Leach before the levy; had a talk with him the second time I went to levy; didn't tell him that I would not levy upon the growing crop, except some corn, which was some time thereafter; had no conversation with him as to the 9,000 pounds in gin. On the 4th or 6th I levied on the growing crop. I had executions with me; found negroes in the field picking cotton, and drove them out, telling them I had executions and would levy, and they left. When I levied on the 2d, I left the cotton in the gin-house — went to sell on the 22d of September. My possession was as I told you. I went through the (289) field two or three different ways, told the hands I had executions in favor of Wisenfield Co., against Jowers, and think I read them, and told them to leave, and they did so; they were colored people. Patterson, a white man, came out; they came outside of the field into a little enclosure; don't recollect that I examined cotton then; put nobody in charge of cotton in the gin, or of the growing crop, after the levy. I went back to Rockingham, thirty miles from Jowers' farm, after the levy. On day of sale, I sold growing crop, and McNeill McNeill, as attorneys for Wisenfield Co., bought it and I delivered it to them The cotton in the gin was not sold; only sold what was bought that day."
Louis Johnson testified, that McLean Leach hired him to haul cotton, and that he got some out of the gin-house and some out of the crib from Jowers' place. . . . Jowers opened the crib, but witness did not know how.
This was the case for the plaintiff. The defendant then offered in evidence three agricultural liens, executed by Jowers to McLean Leach, copies of which are filed with the record, one for $700, dated 1 April, 1881, recorded in Richmond 29 April, 1881, one for $700, dated 11 August, 1881, and recorded in Richmond 3 September, 1881, and one for $300, dated 1 April, 1881, and recorded 28 April, 1881, in Robeson County.
John Leach testified for the defendants, that he was a member of the firm of McLean Leach, and that Jowers' farm was in Richmond and Robeson counties. . . The gin-house, crib and cotton growing in the field were on the part in Richmond. McLean Leach had advanced under the liens $1,699.12 to 1 October, 1881; had advanced $1,300 from 1 April to 2 September. . . . Before the levy and before Morrison *Page 233 
went to the farm, Jowers had delivered the crop to McLean Leach to satisfy their liens, and he then had nothing more to do with it. McLean Leach gathered the crop. The cost of gathering and shipping were about $500. Advancements, costs of gathering, etc., were (290) about $1,800 or $2,000 . . . . Jowers did business in 1881 in Shoe Heel, Robeson County; voted there; slept and ate there; has been there ever since in the same way; is now deputy sheriff of Robeson County. . . . The crop was turned over to McLean Leach on 2 September, and they sent a man there the next day to take charge. At that time they had struck no balance to ascertain the amount due. No change was made in the manner of keeping account with Jowers. McLean Leach were having the cotton picked in the field from 2 to 22 September, the day of sale. . . . Jowers had but one house, and it was in Richmond County; he had charge of the place and called it his home. He had no place in Shoe Heel of his own. He lost his home place a short time after this. Three issues were submitted to the jury:
1. Is the plaintiff the owner of the property described in the complaint?
2. Did the defendants unlawfully and wrongfully convert to their own use 7,500 pounds of seed cotton, and 2,500 pounds of cotton growing and matured, levied on by plaintiff, or any part thereof?
3. If so, what damages did the plaintiff sustain?
Defendants asked his Honor to charge:
1. If the jury believe that prior to 1881, J. D. Jowers had been a resident of Richmond County, the mere fact of his eating and sleeping at Shoe Heel would not of themselves divest him of his residence in Richmond.
2. If they believe that McLean Leach and Jowers agreed on the property to be sold, the presumption is that the right of property passed at once, unless there be something to indicate the contrary intention; and this is so, although nothing is said about payment or delivery, and the property passed immediately to McLean Leach.
3. That plaintiff can only recover such an interest as Jowers (291) owned at the time of levy; and if prior to levy Jowers had bona fide transferred for value to McLean Leach the crop described in the pleadings, the plaintiff cannot recover.
4. If the jury believe that plaintiff, through his deputy Morrison, made a levy on the property, and afterwards abandoned the levy, he cannot recover in this action; that it was his duty to take actual possession of the property in the gin-house and crib, and remove it to a place of safety, and if he failed to do so, the plaintiff cannot recover.
5. That before plaintiff can recover, the jury must be satisfied from the evidence, that the cotton received by defendants, if they received *Page 234 
any, was the identical cotton levied on by Morrison, if he did make such levy, in the gin-house and crib on 2 September, 1881, and the same as to growing crops that were grown on Jowers' farm in Richmond County, and gathered between 6 and 22 September, 1881.
6. That as plaintiff alleges the conversion of seed cotton, he must prove that defendants received and converted seed cotton; if he fail to do so, he cannot recover. Proof that they received cotton in bale, or lint cotton, is not proof that they received and converted seed cotton.
His Honor gave instructions 1, 2 and 4, with modifications, one of which was: "That if the jury believe that the plaintiff abandoned the levy made on the property described in the complaint, then the plaintiff cannot recover, but that it was not the duty of the plaintiff to take actual possession of the property, or to remove it. That the defendants contended that the plaintiff had abandoned the levy; but if the jury believe the facts in regard to the levy as testified to by Morrison, that there had been no abandonment of the levy; that if Morrison went there and took possession of the cotton in the gin-house and crib, and locked up the same and nailed the doors, and left it so and came to (292) Rockingham, with the intention of returning and selling the same, and did so return, this would not be an abandonment."
The other prayers for instructions were not given.
The verdict was in favor of the plaintiff, and defendants moved for a new trial:
1. For refusal to give instructions asked for by defendants.
2. For misdirection in the charge as given, and remark to juror at the conclusion of the charge.
(This remark was in response to a question asked by a juror, "Suppose Jowers was not a resident of Richmond County at the time of the execution of the liens, but that before the levy he had turned the property over to McLean Leach, for a debt due to them, what would be the effect of it?" to which his Honor replied, "that he had already charged them that they could not consider that in this case, as the evidence did not present this view.")
3. For expression of opinion, in that he informed the jury that the levy had not been abandoned by the plaintiff.
The motion for a new trial was overruled, and judgment given in favor of plaintiff on the verdict, from which defendants appealed.
We need not consider the alleged error, in the response of his Honor to the inquiry of the juror, nor the *Page 235 
questions raised by his refusal to give the third and sixth instructions asked for, as we are of opinion that the defendants are entitled to a new trial for error in the charge complained of, and for refusal to give the fifth prayer for instruction to the jury.
His Honor seems to have assumed that there was no evidence (293) upon the question of levy and abandonment, except that contained in the testimony of the witness Morrison, whereas the witness Leach testifies to a conversation with Morrison, in regard to the levy, in which Morrison said he did not think he had a right to levy, and that he would wait until he saw Mr. Shaw, who was then in New York. Morrison denies that he had any conversation with Leach before the levy. Leach further testifies, that before Morrison went out to the farm, Jowers had turned over the crop "to us," meaning McLean Leach, and that after that, they had the control of it. Where there are conflicting statements, as a rule, the judge ought not to single out a witness and say to the jury, "if you believe him, you must find in accordance with his testimony." "There may be," says Reade, J., in Brem v. Allison,68 N.C. 416, "cases where it would be proper, but generally it is safer to put the case to the jury upon all the evidence, with proper explanations." See, also, Anderson Young v. Steamboat Co., 64 N.C. 406;Jackson v. Commissioners of Greene, 76 N.C. 282.
If the witness Leach is to be believed, the property never was seized by the plaintiff. In Rives v. Porter, 4 Ired., 76, Ruffin, C. J., says: "It answers the purpose of giving notoriety to the levy, for the officer to take possession of the chattels on the premises, provided he remain there with them, so as to be in a situation to exercise that dominion which owners in possession usually exercise." Here the testimony of Leach would leave it in doubt whether the plaintiff ever had or exercised any dominion over the property.
A seizure is necessary, and if from the nature of the property (as is the case with the growing crop, but not of the cotton in the gin and crib), an actual seizure be impossible, some act as nearly equivalent to a seizure as practicable, must be substituted for it. S. v. Poor, 4 D. B., 385.
The defendants were entitled to the instructions asked for in (294) the fifth prayer. The complaint alleges the conversion by the defendants of seed cotton. There is no evidence that they ever received any seed cotton, but it is insisted that the baled cotton shipped to them by McLean Leach was the same cotton, after it was ginned, which they (McLean Leach) had gotten from the Jowers place. Whether this was a fatal variance between the allegations of the complaint and the proofs, as insisted by the defendants, or not there was some question as to whether the cotton received by the defendants was the identical *Page 236 
cotton claimed to have been levied on by Morrison, and the defendants were entitled to have it considered by the jury. The witness Leach says (and his was the only testimony that in any way connected the defendants with the cotton), "we shipped the cotton to Hall Pearsall (defendants), at least a portion of it — most of it to them. . . . To the best of my recollection we shipped it all to them — 45 or 46 bales," and afterwards he says: "I cannot say as to shipping the identical cotton in the gin-house to Hall Pearsall." Forty-five or forty-six bales of cotton are many times greater, in quantity than the seed cotton claimed by the plaintiff would have yielded, and the only witness upon the point says that he cannot say that it included the identical cotton. It was the duty of the plaintiff to show, affirmatively, by a preponderance of evidence, that it was the identical cotton, and if the evidence presented any question on that point, it was for the jury to weigh and determine it.
The defendants are entitled to a new trial. Let this be certified.
Error. New trial.
Cited: Farthing v. Dark, 109 N.C. 299; Gregg v. Mallet, 111 N.C. 79;Bowman v. Trust Co., 170 N.C. 303; S. v. Moore, 192 N.C. 210.
(295)