## WILLIAMS v. SOUTHERN RAILWAY CO.

(Filed March 25, 1902.)

1. NEGLIGENCE—*Evidence—Sufficiency—Questions for Jury—Railroads.*

   The evidence in this case as to negligence of defendant is not sufficient to be submitted to the jury.

2. NEGLIGENCE—*Evidence—Questions for Court—Railroads.*

   Where the evidence is uncontradicted, the question of negligence is for the court.

CLARK and DOUGLAS, J.J., dissenting.

ACTION by Williams & Garrett against the Southern Railway Company, heard by Judge *O. H. Allen* and a jury, at Spring Term, 1901, of the Superior Court of HERTFORD County. From a judgment for the plaintiffs, the defendant appealed.

*L. L. Smith,* for the plaintiffs.
*Geo. Cowper* and *F. H. Busbee,* for the defendant.

FURCHES, C. J. On the 19th of April, 1897, the defendant company ran a train over the track of the Norfolk and Carolina Railroad Company, between Tunis and Ahoskie, and soon after said train passed, a fire was discovered in the woods near by, which spread rapidly and burned the plaintiffs' wood. The evidence all showed that the fire originated beyond the right-of-way, and the Judge so told the jury. Two trains of the Norfolk and Carolina had passed over said

track not long before the, fire was discovered, and there was a steam sawmill in operation at the time the fire was discovered about the same distance from the fire as the railroad track.

There were several witnesses examined, who testified as to the length of time after the defendant's train passed before the fire was discovered, the direction of the wind, the rapid spread of the fire, and the destruction of the plaintiff's property.

The plaintiff offered no evidence connecting the defendant with the fire, except the passing of the train and the fire, and offered no evidence of negligence, unless the following is such evidence: A. A. Newsome testified: "I was there and saw the train; noticed smoke and sparks; it seemed to be exhausting; at the time I called attention to it and noticed sparks, sparks came over from the railroad toward the store, and then towards me on the east side." And J. M. Walden, who testified that, "I recollect the fire; the wind was west—a little more west; I got to the fire first; I saw the size of a flour barrel. The southbound train passed 15 minutes before I discovered it; railroad west from origin of fire; mill south; 93 yards from origin of fire to mill, and 85 yards to railroad; I noticed the train as it passed; weather very dry and wind rapid; there was much smoke coming out of the smoke-stack of engine; thought train slowed up, but am not certain about it; smoke was going directly towards woods; saw smoke and sparks going towards woods."

This was the evidence upon which the plaintiff contended that negligence of the defendant was shown.

Among other evidence, the defendant offered the testimony of Jeffries as to the condition of the train, as follows: "I was fireman on train No. 15, engine 945, on the 19th of April, 1897. Its equipment for preventing fire was perfect; so far as I know, no change had been made; engine was in good condition. It had been out of the shop about ninety days. I

continued to fire it until July. I can't say whether the engine was inspected or not. Opening the furnace door decreases the draft. Frequent firing causes black smoke, but has no effect to increase sparks when straining. It was a light train. Heavy trains cause engine to strain. The engine was capable of hauling 8 or 10 cars easily; on this occasion it was pulling only three. Spark arrester is not placed in the smoke-stack of the engine, but over the furnace, and it is stationary. Its effect is to prevent the escape of fire and sparks; does not prevent it entirely; if so, it would wholly cut off draft and engine could not run."

There was no evidence in the case that contradicted or tended to contradict this evidence, unless that offered by the plaintiff and quoted above does.

Among other instructions the defendant requested the Court to charge: 1. That upon the whole evidence the jury must find that the defendant was guilty of no negligence and the plaintiff can not recover." The defendant also asked the Court to charge that, "If the jury believe the uncontradicted testimony of the defendant's witnesses, the engine from which the damage is alleged to have come was in good condition, and had a proper arrester, and was skillfully operated and managed, and that plaintiff could not recover." These prayers were refused and the defendant excepted.

The Court then charged the jury that there was no evidence tending to show that the fire originated on the right-of-way. "So the question of negligence need only be considered with reference to the condition of the engine, and its management and operation at the time." The Court further charged that, "If the jury find by the preponderance of the evidence that the fire originated from the defendant's engine, then, if nothing else appeared, the plaintiff would be entitled to damages; so that, if it is shown by the preponderance of evidence that the fire originated from the defendant's engine, the burden

shifts to the defendant to show by the greater weight of evidence that the engine at the time was in good repair, and was equipped with approved appliances to prevent the escape of fire, and was at the time managed and operated in a careful manner by a skilful engineer. It is as if this was submitted to you in a separate issue, and if this is shown by the greater weight of evidence, then the plaintiff can not recover, even though the woods caught fire from the defendant's engine." Defendant again excepted.

We think there was error in refusing to charge as requested and in the charge as given.

The exception to the refusal to give defendant's prayers for instruction and the exception to the charge as given, resolve themselves substantially into the same error.

The Court properly instructed the jury that there was no evidence tending to show that the fire originated on the right-of-way, and their only enquiry as to negligence should be as to the train—whether it was properly equipped, manned and managed. *Blue v. Railroad,* 117 N. C., 644. And it seems to us that he should have told them there was no evidence to show negligence in the running and managing of defendant's train. The simple fact that the engine emitted black smoke and some sparks as it passed along the track on schedule time, is not such evidence of negligence, if any evidence at all, as should have been submitted to a jury to prove negligence (*Wittkowsky v. Wasson,* 71 N. C., 451), as it is shown that all engines emit some smoke and sparks. In fact, it is shown that they can not "live" and work, without doing so.

But if this is not so, the other prayer of the defendant should have been given—"That if the jury believe the uncontradicted testimony of the defendant, the engine was in good condition, properly manned and managed, and the defendant was guilty of no negligence on that account, and the plaintiff could not recover." It is contended that this prayer was

properly refused, because it only referred to the *uncontradicted evidence of the defendant.*   And while it is admitted that there is a rule of that kind, we do not think it applies to a case like this.   That rule applies where there is contradictory evidence—evidence on both sides—and is laid down in *Gaither v. Ferebee,* 60 N. C., 303, and yet the discussion of the rule in that case shows that it should not apply in this case. The case of *Harris v. Murphy,* 119 N. C., 34 (56 Am. St. Rep., 656), sustains this prayer of the defendant and shows that it should have been given.   It is held in *Anderson v. Steamboat Co.,* 64 N. C., 399:   "The facts being ascertained, negligence is a question for the Court.   When the testimony is all on one side, or is not contradictory, the Court can decide whether there is or is not negligence."   When it is contradictory, it must be submitted to the jury with proper instructions as to the law, that they may find the facts.   So it would seem that as all the evidence in the case, as to the condition of the defendant's train, was one way, it presented a question of law for the Court, if true, and the Court should have so instructed the jury  that if they believed this evidence they should find for the defendant.

The Court also erred in submitting this question, as to the condition and management of the defendant's train, to be .found by the jury upon the *preponderance* of the evidence, and the *greater weight* of the evidence, as there was no evidence on the side of the plaintiff  upon that question to preponderate or weigh against the evidence of the defendant.

There was error, for which a new trial is awarded the defendant.

New trial.

DOUGLAS, J., dissenting.   I can not concur in the opinion of the Court, because it seems to me to be contrary to well-established rules of evidence.   The Court says, in substance,

that there was no evidence of the negligence of the defendant, overlooking the rule that the mere fact of the engine having set fire to the land is of itself *prima facie* evidence of negligence. This rule was laid down by this Court as far back as its December Term, 1841, in *Ellis v. Railroad,* 24 N. C., 138, where the evidence is thus stated: "The plaintiff proved that he had a line of fence running parallel with the railroad track, belonging to the defendants, at the distance of fifty feet, in the county of Northampton; that on a certain day in the spring of 1839, immediately after the passage of one of the locomotives belonging to the defendants, the fence was discovered to be on fire, and about five hundred panels of fence were burnt before the fire could be stopped. The plaintiff's witness further proved that the engines run on the road usually had the spark-catchers on the funnel, but whether they were on *upon that day* he did not recollect." This is all the evidence there was of negligence, and yet a verdict for the plaintiff was sustained. This Court, speaking through Gaston, J., thus clearly lays down the rule, with the reason therefor: "We admit that the gravamen of the plaintiff is damage caused by the negligence of the defendant. But we hold that when he shows damage resulting from their act, which act, with the exertion of proper care, does not ordinarily produce damage, he makes out a *prima facie* case of negligence, which can not be repelled but by proof of care, or of some extraordinary accident, which renders care useless." That case has never been overruled or even doubted, but has been repeatedly cited with approval, and especially in the following cases: *Aycock v. Railroad,* 89 N. C., 321; *Lawton v. Giles,* 90 N. C., 374; *Grant v. Railroad,* 108 N. C., 462; *Haynes v. Gas Co.,* 114 N. C., 203 (26 L. R. A., 810), (41 Am. St. Rep., 786). In Aycock's case, Smith, C. J., in discussing "the question as to the party upon whom rests the burden of proof of the presence or absence of negligence, where only injury is shown, in case of fire from emitted sparks," says, on page 329:

"We prefer to abide by the rule so long understood and acted on in this State, not alone because of its intrinsic merits, but because it is so much easier for those who do the damage to show the exculpating circumstances, if such exist, than it is for the plaintiff to produce proof of positive negligence. The servants of the company must know and be able to explain the transaction, while the complaining party may not; and it is but just that he should be allowed to say to the company, 'You have burned my property, and, if you are not in default, show it and escape responsibility.' We, therefore, sustain the Judge in this part of his charge. Again, there was negligence in permitting the inflammable material in which the fire began to remain so near the track and liable to ignite from emitted sparks."

The use of the word "again" following the preceding section clearly shows that leaving inflammable matter upon the right-of-way was regarded as a distinct act of negligence, in addition to the negligence presumed from the mere fact of setting fire to the land. In fact, the Court had already decided in favor of the plaintiff before considering this last act of negligence.

In *Moore v. Parker,* 91 N. C., 275, this Court says, on page 279: "We adhere to the rule laid down in the recent case of *Aycock v. Railroad,* 89 N. C., 321, and enunciated in these words, originally proceeding from the pen of Judge Gaston: "Where he (plaintiff) shows damages from their (defendants') act, which act, with the exertion of proper care, does not ordinarily produce damage, he makes out a *prima facie* case of negligence, which can not be repelled but by proof of care, or of some extraordinary accident which renders care useless."

In *Haynes v. Gas Co.,* 114 N. C., 203 (26 L. R. A., 810), (41 Am. St. Rep., 786), Burwell, J., says, for the Court, on p. 208: "Guided by the principle announced in these cases, we

come to the conclusion that this plaintiff should have been allowed to say to this defendant: 'The wire you put in the street killed my son while passing along the highway, as he had a right to do. If you are not in default, show it and escape responsibility.' " Citing *Ellis v. Railroad, supra; Moore v. Parker, supra; Aycock v. Railroad, supra;* Ray on Negligence, Imp. Duties, 145; Wood's Ry. Law, 1079; Whitaker's Smith Neg., 423. It would seem that these home authorities would be sufficient for the purposes of this case, but a very slight investigation will show that we are not alone in our view of the law. It is said, in 13 A. and Eng. Enc. (2d Ed.), 498: "The English rule, and that supported by a large number of American cases, is, that the mere communication of fire by a railroad engine is of itself sufficient to raise a presumption of negligence against the company"—citing a long list of cases from England, the United States (Federal cases), Alabama, Arkansas, Georgia, Illinois, Indiana, Iowa, Kansas, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia and Wisconsin.

It is worthy of note that such conservative States as Connecticut, Maine, Massachusetts and New Hampshire, among others, should have provided by statute that, as to fires set out by railroad companies, there shall be an absolute liability for loss, irrespective of the question of negligence on the part of the defendant. 13 A. and E. Enc. (2d Ed.), 419.

It would seem that this was the common law in England as to all classes of fires, until changed by the statutes of 6 Anne, C., 31, and 14 George III, C., 73, amended by 7 and 8 Vict., C. 84.

It is well settled that in an action for damages any essential fact may be proved by circumstantial evidence. This rule is supported equally by reason and authority, but time

will not permit any unnecessary discussion. If a man may be hanged on circumstantial evidence, I see no reason why it should not be sufficient in civil actions requiring only a preponderance of the testimony.

The rule laid down in Ellis' case is further strengthened by the practically universal acceptance of the principle that where a particular fact, necessary to be proved, rests peculiarly within the knowledge of a party, upon him rests the burden of proof. *Railroad v. U. S.,* 139 U. S., 560, 567; *Mitchell v. Railroad,* 124 N. C., 236 (44 L. R. A., 515); *Hinkle v. Ry.,* 126 N. C., 932, 938 (78 Am. St. Rep., 685), and authorities therein cited.

As the spark-arrester is inside the engine, the ordinary plaintiff would never see it, and probably would not know it if he did see it. It is, therefore, impossible for him to prove its condition by direct evidence, outside of the defendant's own employees, whose negligence was, perhaps, the cause of the injury. It would be almost as difficult for the average witness to a country fire to say whether the emission of sparks was *unusual.* It seems to me that, under the present state of efficiency to which spark-arresters have been brought, any noticeable emission of sparks would be some evidence tending to prove that the arrester was not in perfect condition. We should remember that it is almost impossible to see during the day time any spark that can come through a mesh running two and a half spaces to the inches, which, I believe, is the usual size. Counsel for defendants frequently insist that it is common knowledge that the escape of sparks can not be entirely prevented without cutting off the draft. I think it is equally common knowledge that the average man knows nothing about a spark-arrester, except that it has holes in it. For this reason I have made a rough drawing, from a printed cut in *Locomotive Engineering* of the smoke-box of an engine. It is supposed to represent the average locomotive with extension

front.    Whatever variations may exist in the different makes of engines, or defects in the drawing, will not, I think, materially affect the principle.

A—Flues.
B—Deflector Plate.    Bb—Deflector Plate and Adjuster.
C—Nozzle Stand and Tip.
D—Forward part of Smoke-stack.
EEE—Wire netting.
FF—Petticoat or Draft Pipe.
G—Smoke-stack.
H—Smoke-arch door.
I—Cinder chute.

Referring to the drawing, A are the flues; BB, the deflector plate; Bb, the deflector plate adjuster; C, the nozzle stand and tip; D, forward part of smoke-box; EEE, the wire netting or spark-arrester proper; FF, the petticoat or draft pipe, being in effect a downward extension of the smoke-stack; G, the smoke-stack; H, the smoke-arch door; I, the cinder chute. When the engine is moving, the direct draft is caused by the exhaust steam being forced out of the nozzle directly upward through the smoke-stack. There is a smaller steam pipe called the blower, to be used in creating a draft when the engine is at rest, but that does not seem to affect the present matter. The sparks coming from the flues strike the deflector plate, and are turned downward, passing under the plate. Some of them may be carried directly upward, and, if small enough to pass through the netting, will go out the smoke-stack with great force. The large bulk of the sparks passing under the deflector plate are carried forward by their weight and momentum, and dropped in the front of the smoke-box over the cinder chute. Of the sparks that go through the netting, only those that strike within the petticoat, which is an iron pipe, about sixteen inches in diameter, can get out. Sometimes the petticoat pipe may be omitted when there is a very long smoke-box; but I think it is universally used in this State.

The next question is, what size sparks can escape if the netting and deflector plate are in good condition. The latter is a solid plate. The netting is usually made of No. 10 wire with meshes averaging two and a half to the running inch. Deducting the thickness of the wire, it is evident that the open spaces can not be more than three-tenths of an inch square. For even a cinder of this size to escape, it must strike directly in the center of the opening. If it strikes obliquely or on one side, it will be deflected by the wire. When, therefore, a large cinder does escape, it is evidence tending to prove

that the spark-arrester is not in good condition. The fact that it was once in good condition does not prove that it will always remain so. What is the average effective life of a spark-arrester I do not know. In *Babcock v. Railway,* 62 Iowa, 593, there was evidence tending to show that the durability of the wire netting, used to prevent the escape of sparks, does not exceed two months, and is often a much less period. This seems to me too short a time, but it can not be very long. The heat in the smoke-box is said to vary from 600 to 1,600 degrees Fahrenheit. This intense heat, with the constant abrasion of the flying cinders, must soon destroy the wire and, prehaps, even the deflector plate. The burning out of five or six strands of wire directly under the petticoat or draft pipe, where it would be most apt to burn out, would practically destroy the efficiency of the entire arrangement. Such a hole would be entirely beyond the knowledge of the plaintiff, and could be detected only by a proper inspection. A thorough inspection could, of course, be made only after the engine had cooled off. It would seem that an engine is always working more or less under a forced draft caused by the exhaust steam, and that this can be regulated to a certain extent by the engineer.

How far sparks, which are simply cinders in a state of combustion, can fly, I do not know; but I presume it would depend upon the size of the cinder, the force of the exhaust and the strength of the wind. These are questions peculiarly for the consideration of the jury.

This description, crude though it be, of the nature and operation of a spark-arrester, will enable us to better understand the testimony of the defendant in the case at bar. Its fireman testifies as follows: "Its equipment for preventing fire was perfect; *so far as I know* no change had been made; engine was in good condition. It had been out of the shop about *ninety days.* * * * *I can't say whether the engine*

WILLIAMS *v.* RAILWAY.

*was inspected or not."* What he evidently meant was, that
the equipment was *originally* perfect. This is shown by his
subsequent testimony. His expression, "So far as I know, no
change had been made," was equivalent to saying that he did
not know whether any change had been made or not. He ex-
pressly states that the engine had been out of the shop about
ninety days, and that he did not know whether it had been in-
spected or not. He does not say that he inspected it. It was
no part of his duty to do so. A fireman is not presumed to be
an expert, and is not in charge of the engine, that duty be-
longing to the engineer. It is true he says the engine was in
good condition, but that was only as far as he could see, that
is, that the engine was in good running order. An engine can
run as well, if not better, without a spark-arrester than with
one.

Whatever may have been the condition of the engine as a
running machine, I see no evidence whatever that its *spark-
arrester,* if it had one, was in good condition on the day of the
fire, or at any time sufficiently near thereto to raise any pre-
sumption favorable to the defendant. If such had been the
fact, it would have been easy for the defendant to have intro-
duced its inspector or engineer to testify that he had person-
ally inspected the engine on the day of the fire, or within a
few days before or after, and that he found it provided with a
suitable spark-arrester, properly arranged and in good condi-
tion. In the entire absence of such testimony, the Court can
not presume it.

On the other hand, the testimony of Newsome, that he saw
so many sparks coming from the engine as to make him think
it was exhausting, and to cause him to call attention to it, is
some evidence directly tending to prove that the spark-arrester
was out of order.

Under such circumstances the defendant had no right to
complain at the charge of his Honor, nor, in my judgment,

can the opinion of the Court be sustained, either on the law or the facts. It cites *Blue v. Railroad,* 117 N. C., 644, but that case is not in point. There the issue was submitted to the jury with the charge that the burden was on the defendant to show that its road was "properly equipped with modern appliances sufficient to guard against the escape of fire, and * * * the engine carefully operated by skilful and competent men." Here, it is sought to take the case from the jury on what appears to me a misconception both of law and of fact.

Owing to the length of this opinion, I have omitted many authorities which would otherwise have been cited. I see no error in the trial of the case.

CLARK, J., concurs in the dissenting opinion.