WILLIS et al. v. HEATH.—107 S. W. (2d), 228.

Middle Section.   May 24, 1937.

Petition for Certiorari denied by Supreme Court July 3, 1937.

James D. Richardson, of Murfreesboro, for plaintiffs in error.

C. C. Jackson and Barton DeMent, Jr., both of Murfreesboro, for defendant in error.

FAW, P. J.  Mrs. Nettie Heath sued Jack Willis and Ben Reeves, in the circuit court of Rutherford county, to recover damages for the alleged wrongful death of her husband, W. D. Heath, and obtained a verdict of a jury, and judgment thereon, for $2,500 and costs of suit.

After the overrulement of their motion for a new trial, the defend-

ants appealed in error to this court, and are here insisting, through assignments of error, brief, and oral argument of counsel. at the bar, that there was no evidence adduced in the cause upon which a verdict for plaintiff and against defendants could be predicated, and that, therefore, the trial judge erred in declining to peremptorily instruct the jury, on motion of defendants, to return a verdict in favor of the defendants.

For convenience, we will continue to refer to Mrs. Heath as plaintiff, and to Willis and Reeves as defendants.

There was undisputed evidence before the jury that, on October 4, 1935, a truck, owned by defendant Reeves and driven by defendant Willis, was allowed, by the negligence of Willis, to roll backward against W. D. Heath (then the husband of plaintiff) and press him against a gate with sufficient force to injure his arms to the extent hereinafter described; that said W. D. Heath (then 63 years of age) died on November 29, 1935, about 56 days after he suffered the injuries above mentioned, and that his death resulted from "a stroke of apoplexy," which, according to the proof, is the same as a "cerebral hemorrhage."

It is likewise an undisputed fact of record that defendant Willis was a servant of defendant Reeves, and was driving the truck within the course and scope of his employment as such servant, at the time and place said W. D. Heath was injured as aforesaid.

It is provided by section 8236 of the Code that "the right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by his death, but shall pass to his widow, and, in case there is no widow, to his children or to his next of kin; or to his personal representative, for the benefit of his widow or next of kin, in either case free from the claims of creditors."

It is conceded in this court that the proximate cause of the injuries to the arms of W. D. Heath, suffered by him on October 4, 1935, was the aforesaid negligent act of defendant Willis, but it is insisted for defendants that there is no evidence that the injuries thus suffered by W. D. Heath caused his death. This contention of defendants presents the sole issue for decision by this court.

The injuries suffered by W. D. Heath on October 4, 1935, are described by Dr. A. J. Jamison, who examined and treated his arms shortly after the accident, as follows:

"He had some bruises on his arms and complained a good deal of pain, but there was no fracture and no bad laceration, but in between his radius and ulna, it seemed to be more sore than anywhere else, evidently something on the truck pressed that between the truck and the gate."

There is evidence that, although W. D. Heath had suffered from high blood pressue for a time before he was injured as aforesaid, his general health was "fairly good" and he ate "hearty" and slept "soundly," but that after the accident he lost appetite and weight and did not sleep "soundly"—that he was restless and "up and down" frequently at night, "complained of hurting so bad he could not sleep."

W. D. Heath lived on a farm in Rutherford county, but he was a constable, and after his injury he was in Murfreesboro and continued to discharge his duties as such officer—serving process right along— until a day or two before his death. He "waited on the grand jury" at the October term (1935) of court in Murfreesboro, but "some one would have to carry the books" to the grand jury room for him.

■ It is an undisputed fact on the record that the immediate cause of the death of W. D. Heath was a cerebral hemorrhage, which is also known in medical terminology as apoplexy. It is insisted for plaintiff that the jury could have found from the evidence that the aforesaid injury to the arms of her husband was the producing cause of the cerebral hemorrhage, and was thus the cause of his death. It is thus seen that the record presents a question involving the pathology of disease; that is, the science treating of the nature, causes, progress, manifestation, and results of diseases. See "pathology" in Webster's International Dictionary.

Issues involving the pathology of disease must ordinarily be determined upon testimony of qualified expert witnesses. American National Insurance Co. v. Smith, 18 Tenn. App., 222, 74 S. W. (2d), 1078; Standard Life Insurance Co. v. Strong, 19 Tenn. App., 404, 424, 89 S. W. (2d), 367. See, also, cases cited in Jones on Evidence (2 Ed.), vol. 1, page 812, footnote 8.

In the instant case, two practicing physicians who had treated W. D. Heath, viz., Dr. A. J. Jamison and Dr. E. B. Allen, both of Murfreesboro, were examined as witnesses for the plaintiff; and five physicians and surgeons, viz., Dr. W. G. Robinson, Dr. J. R. Gott, Dr. John Cason, and Dr. B. W. Rawlings, all of Murfreesboro, and Dr. H. M. Tigert, of Nashville, were examined as expert medical witnesses for the defendants. The qualifications of no one of these seven medical witnesses are questioned on the record.

There is also a stipulation of record "that Dr. J. M. Shipp, a practicing physician in Smyrna, attended Mr. Heath at his death, and he would state that he died from apoplexy or cerebral hemorrhage."

The death certificate signed by Dr. Shipp was also read into the record, as follows:

"Date of death, November 29th, 1935. I certify I attended the deceased from November 29th, 1935, to November 29th, 1935, and I last saw him alive on November 29th, 1935. Death was said to

have occurred on the date stated above at four o'clock in the morning.

"Causes of death were as follows: Apoplexy, November 29th, 1935. Contributory causes of importance not related to the principal cause. (Blank).

"Signed, Dr. J. M. Shipp, M. D.

"Certified to by Robert H. White."

Dr. Jamison had been consulted professionally by W. D. Heath at times for several years before Heath's death. He testified that Heath had some teeth pulled a number of years ago, and "after that he had a little neuritis in his arms and hands, and after that he had that hypersensitive condition on and on;" that about 20 months before Heath's death his blood pressure was about 150 to 160 which (Dr. Jamison stated) was not much acceleration for a man of Heath's age, as the general average is about 140; that he saw Heath several days after his arms were injured, and Heath "complained a good deal" —said "he could not sleep and it pained him all the time"—but that "he got rid of some of the soreness in his arms."

Dr. Jamison was asked and answered further questions as follows:

"Q. Supposing that he died from apoplexy, what has a tendency or will cause apoplexy? A. High blood pressure and arteriosclerosis.

"Q. When Mr. Heath would come to you and complain did he worry about his condition or not? A. Not so much. He was a happy go-lucky type of fellow, and he would say, 'I reckon I will get better after a while,' and so on.

"Q. Will worry have a tendency to cause high blood pressure? A. If you have high blood pressure and worry it will cause more of an acceleration.

"Q. If those leaders or arteries or muscles in his arm are injured and bruised, would that have a tendency to stop the flow of the blood so as to cause enough blood pressure to get apoplexy? A. I don't think so. Not materially.

"Q. If his blood pressure was a little above normal before this injury and after the injury his blood pressure went higher, and gradually going down, nothing else happening, other than this injury, could you say that this injury had anything to do with the acceleration in his blood pressure? A. Fright or worry or pain will have a tendency to accelerate the blood pressure.

"Q. Then the acceleration of blood pressure is one thing that will cause apoplexy? A. If you have arteriosclerosis, which he did, have a hardening of the arteries, anything that would raise the blood pressure, worry or fright, when it caused the blood pressure to go up, necessarily would cause more pressure on those arteries.

"The Court: What causes apoplexy? A. Arteriosclerosis.

"Q. What is apoplexy? Does that mean cerebral hemorrhage? A. They are synonymous terms, apoplexy and cerebral hemorrhage.

"Q. You take hardening of the arteries and high blood pressure, both, worry and pain is a bad combination? A. You always have some acceleration of blood pressure when you have hardening of the arteries. You take your blood pressure,—or take some of these older men, their blood pressure is accelerated because their arteries are not as elastic as yours or some other man."

We also quote from the cross-examination of Dr. Jamison as follows:

"Q. Mr. Heath died from apoplexy? A. Yes, sir.

"Q. That is the bursting of a blood vessel in the brain? A. Yes, sir.

"Q. Or a cerebral hemorrhage? A. Yes, sir.

"Q. Can you figure how a bruise on the arm would cause apoplexy two months later? A. It would be kind of hard. If a man suffers pain it might cause a very slight acceleration in the blood pressure."

Dr. Allen stated that he made an X-ray picture of W. D. Heath's injured arm, at the request of Dr. Jamison; that Heath's arm was "swollen, red and inflamed, and he could not turn his hand over," but that "the X-ray did not show a fracture." Dr. Allen did not express an opinion as to the cause of Heath's death; but he was asked and answered as follows:

"Q. What will cause apoplexy, and what does cause it? A. Well the only way you could answer those questions is like you cause a blow out,—whenever you put to much air in an old tire it blows out, and when you put too much pressure on old arteries it will cause a blow out.

"Q. Did Mr. Heath complain with much or little pain? A. He complained that he was suffering much. His arm was swollen.

"Q. Did he worry much about his condition? A. He seemed to be worrying very much.

"Q. Will pain or worry have a tendency to raise a person's blood pressure? A. It will. Just like getting scared or excited, worry will do it."

Dr. Robinson, medical witness for defendants, was asked and answered a hypothetical question as follows:

"Q. Now Doctor assume the following state of facts to be true: That the man in question is sixty-three years of age. Some years ago, say five or six or seven, before he reached the age of sixty-three, that he suffered from an infection of the gums, had his teeth extracted. During the following years he suffered from pains in his arms and hands; he complained to his family physician that his arms were hurting him constantly and he felt a numbness in one or both of his hands. Assume further that he had a capable physician who diagnosed his trouble as neuritis. Before the accident to be referred to in a moment he had blood pressure ranging from 150 to 160; the ac-

184

cident occurred on October 4th, 1935, when a truck backed against his arms and bruised them. After the accident his blood pressure never was taken again. However, he complained of more pain in his arms and hands after the accident, than he did before; he was not as active in his work and there was an inability on his part to lift books and to do his regular work as he had done it prior to the accident; he suffered some inability in raising his hands to lift a heavy object and when he did lift an object of that .sort it pained him. Now, after this accident to his arms when they were bruised on October 4th, he died on November 29th, about seven weeks later, from what the layman would call a stroke of paralysis or a stroke of apoplexy, which you would call cerebral hemorrhage, they are about the same. A. The same.

"Q. And he died suddenly, and a capable physician, Dr. Shipp of Smyrna, whom you know, pronounced his death as being attributable to apoplexy. Now, Doctor, I want to ask you if the bruises which he received on his forearms in your judgment in any way contributed to that cerebral hemorrhage which caused his death, about two months later? A. I don't see how it could have contributed to that sudden death."

In the course of an extended cross-examination of Dr. Robinson, plaintiff's counsel propounded certain hypothetical questions to the witness, which, with the answers to the witness thereto, are as follows:

"Q. Now, doctor, assuming that a man was in a fairly healthy condition, however, he may have been bothered to some extent slightly with blood pressure, but on to-day he is in a fairly healthy condition, able to work, able to go about, not worried, not in pain, then he receives a lick on his arm and breast by being mashed, the veins in his arms being mashed and to be bruised, bad arm and bruised shoulder, and from that day on for four, five or six days, he suffers pain constantly, he can't rest, he worries, he weakens, has a stroke of apoplexy and dies, what do you say the probabilities are that caused that stroke? A. I can't feel that the injury was contributory to it.

"Q. I did not ask you a thing about that. I asked you what caused his death? A. I don't know.

"The Court: He meant such injury as he described. Do you feel that that contributed to his death over a month later? A. I don't feel that the injury contributed to the death over a month later.

"Q. What do you feel did? A. Not seeing him I don't know, but I know we have people to die frequently from cerebral hemorrhage and apoplexy that have never been injured at all.

"Q. You know this Doctor, 'A blow on the head, which in all probability would have caused no serious injury to a normally healthy man but which caused the death of an employee who was suffering from arteriosclerosis, may be held to be an accident.' A. Arterio-

sclerosis. I thought you in your question, the injury was on the forearm. There is a vast difference between a lick on the forearm and the head.

"Q. I am talking about the head now. Is that true or not on the head? A. Yes, sir.

"Q. Is it not true that an injury on other parts of the body, while it may not be so quick, so instantaneous, still might it not cause the same thing, and take more time? A. In my opinion, no. . . .

"Q. Do you know, any bruise of the arm, finger, or any other part of the man that causes it to turn black, swell, stay swollen for six weeks or two months, that continually gives you pain, gives you aches, keeps you from sleeping, is somewhat serious if it lasts that long? A. Yes, it is serious if it is as you describe.

"Q. And you don't know if that condition existed for approximately fifty-six or fifty-seven days, it might cause a rupture of the blood vessel and cause death? A. It is my opinion if such a thing were going to happen it would happen within a very short time after the injury.

"Q. How long would you think it would take a person in the condition I have just described to you, for it to produce death from a bursting blood vessel? A. It would be a matter of hours rather than days.

"Q. You are certain it could not be days and probably a week aren't you? A. I am certain in my own mind, that is my opinion.".

Although not literally the same, a question predicated upon substantially the same hypothetical statement of facts was propounded to the other four medical witnesses introduced on behalf of defendants.

Upon the hypothesis thus stated, Dr. Gott was asked if, in his opinion as a physician, based on his studies and experience, "those injuries on his arms contributed to his death," and he replied, "I think not."

Upon the same hypothesis, Dr. Cason was asked, what, in his judgment, "did his having those injuries on his arm have to do with the bringing about of that cerebral hemorrhage," and he replied, "I do not think, occurring in that long a time limit, that it could conceivably have anything to do with his death from cerebral hemorrhage at all."

To the same question, Dr. Rawling replied: "In my opinion the cerebral hemorrhage had no connection with the bruise on his arm."

Upon substantially the same hypothesis Dr. Tigert was asked if, in his judgment, "those bruises on his arms contributed or had anything to do with that cerebral hemorrhage two months later;" and he replied, "I am of opinion that it did not."

Each of the defendants' medical witnesses was subjected to a

lengthy and rigid cross-examination by the able counsel for plaintiff, but we do not find that they, either directly or inferentially, receded from the opinion stated in their testimony hereinbefore quoted.

The undisputed testimony of the medical witnesses shows that the cause of a cerebral hemorrhage is high blood pressure acting upon blood vessels weakened by disease, and that such degeneration of the blood vessels (known as arteriosclerosis) is a progressive disease, which requires years of time to weaken the blood vessels to the danger point, and which results from a variety of causes, such, among others, as senility, overeating, excessive use of tobacco or alcohol, and certain diseases of the blood. It likewise appears from the testimony of defendants' medical witnesses that if by any possibility a traumatism —an external bodily injury—could cause a cerebral hemorrhage, it would necessarily occur "immediately" upon the injury, and not several weeks later; and in this opinion plaintiff's witness, Dr. Jamison, evidently concurred, for he testified that "it would be kind of hard" to "figure how a bruise on the arm would cause apoplexy two months later."

If there was evidence that the cerebral hemorrhage of which W. D. Heath died was caused by the aforesaid injury to his arms, the injury would, in law, be a proximate cause of his death, for "what is meant by 'proximate cause' is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning." Grigsby & Co. v. Bratton, 128 Tenn., 597, 603, 163 S. W., 804, 806.

There is some evidence that such an injury as that suffered by W. D. Heath on October 4, 1935, "might" temporarily increase the blood pressure, but there is no evidence that, as a matter of fact, his blood pressure was higher at any time after the injury than before.

In view of the variety of causes of arteriosclerosis and high blood pressure, the progressive nature of these diseases, and the absence of evidence excluding other causes, a finding by the jury that the cerebral hemorrhage suffered by W. D. Heath was caused by the aforesaid injury inflicted by the negligence of defendant Willis, would depend upon speculation, or a mere guess. A verdict cannot be based upon a conjecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 396, 242 S. W., 646; Chicago, etc., Railroad Co. v. Coogan, 271 U. S., 472, 473, 478, 46 S. Ct., 564, 566, 70 L. Ed., 1041, 1045; Patton v. Texas & P. Railway Co., 179 U. S., 658, 663, 21 S. Ct., 275, 45 L. Ed., 361, 364; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S., 333, 344, 53 S. Ct., 391, 395, 77 L. Ed., 819, 825; Hart v. Union City, 107 Tenn., 294, 64 S. W., 6; Pryor v. Railway Co., 2 Tenn. Civ. App., 198; Virginia & S. W. Railway Co. v. Hawk (C. C. A.), 160 F., 348; Williams v. Southern Railway Co., 130 N. C., 116, 40 S. E., 979; Hughes v. Railway Co., 91 Ky., 526, 16 S. W. 275.

It results that the defendants' assignments of error are sustained, the judgment of the circuit court is reversed, the verdict of the jury is set aside, and the plaintiff's suit is dismissed. The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff, Mrs. Nettie Heath, and the surety on her bond for costs below.

Crownover and Felts, JJ., concur.