H. T. MAHONEY

v.

UNITED STATES of America.

Ruby Thelma Loftis PIERCE, Administratrix of the Estate of Howard Nelson Pierce, Deceased,

v.

UNITED STATES of America.

Maymie Lou BECKHAM, Administratrix of the Estate of William Kirk Beckham, Deceased,

v.

UNITED STATES of America.

Civ. A. Nos. 4214, 4330, 4395.

United States District Court
E. D. Tennessee, N. D.

July 16, 1963.

Calvin Walter, Knoxville, Tenn., for plaintiffs.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., McAfee Lee, Knoxville, Tenn., and Kenneth McCasland, Oak Ridge, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

These cases, three in number, are actions to recover damages under the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b) [1] and Section 2674.

The Act makes the Government liable "respecting * * * tort claims * * * in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Discretionary functions or duties are excepted. § 2680(a). [2]

The Government, through the Atomic Energy Commission, hereinafter some-

---

[1] "* * * the district courts, * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

[2] "(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or per-

times called AEC, is engaged in a program of production and development of atomic energy at Oak Ridge, Tennessee. Plaintiffs were employees of Union Carbide Nuclear Corporation, an operating division of Union Carbide Corporation, hereinafter sometimes called Carbide, that operates the production facilities at Oak Ridge at the instance of AEC under a cost type Government contract with the United States.

This Court has previously held that Carbide is an independent contractor in the operation of the Government plants at Oak Ridge. (Mahoney v. United States, D. C., 216 F.Supp. 523.)

Plaintiff Mahoney claims that the disease which renders him permanently and totally disabled and the other two plaintiffs claim that the deaths of their respective intestates were caused by the negligence of the Government in the operation of the Oak Ridge Gaseous Diffusion Plant K–25 in that the living plaintiff and the two decedents in the course of their employment were exposed to radioactive substances or toxic gases. That the defendant failed to provide adequate safeguards, failed to furnish a safe place to work, failed to provide adequate medical supervision, proper equipment, proper protective clothing, particularly respirators or gas masks necessary to screen out any toxic gases or radioactive materials to prevent the employees from breathing them.

Plaintiffs claim further that defendant violated Sections 50–401 [3] and 50–403 [4] of the Tennessee Code and that such violations were the proximate cause of their injuries.

Plaintiffs likewise claim that their conditions were either caused or accelerated from toxic gases and radioactive materials to which they were subjected and that as a result plaintiff's intestate Wilson Kirk Beckham died on April 24, 1962 from Hodgkin's disease, which is a type of blood cancer, and plaintiff's intestate Howard N. Pierce died on January 13, 1961 from acute granulocytic [5] leukemia and plaintiff Mahoney is presently suffering from chronic lymphatic leukemia.

Plaintiffs also claim that the operation of the K–25 plant constituted an ultrahazardous activity and that the United States had a non-delegable duty to assure its operation in such a manner as to avoid injury to plaintiff or plaintiffs' decedents.

The Government denies all acts of negligence and also denies plaintiffs (plaintiffs will be used hereafter at times as if Pierce and Beckham were living) were engaged in inherently dangerous or ultrahazardous activities. The Government further denies that there was any causal relation between plaintiffs' diseases and their employment.

Contributory negligence is pleaded as a bar to the actions. Defendant denies that Sections 50–401 and 50–403, T.C.A., apply to the operation of the Diffusion Plant at Oak Ridge but if applicable, that any of the sections were violated.

It is claimed that the operation of the Oak Ridge plants is a discretionary function which exempts the Government from liability (28 U.S.C. § 2680) and that plaintiffs' actions are barred by the two-year statute of limitations (28 U.S.C. § 2401).

The controlling issues in the case are:

(a) Was the Government guilty of any act of negligence that proximately caused the disability of the living plaintiff and the disabilities and deaths of plaintiffs' intestates?

formance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

3. Section 50–401 is the definition section.

4. "No employer as defined in this chapter shall use in his business or place of em-

ployment any material or process in such a way as to create a condition which upon examination is found to be injurious to the health of those employed therein, without rendering same harmless as far as practicable."

5. Granulocytes are a form of white blood cells (leukocyte).

■ (b) If the Government was guilty of proximate negligence, were plaintiffs guilty of proximate contributory negligence or remote contributory negligence? (Proximate contributory negligence would bar a recovery under Tennessee law and remote contributory negligence would mitigate the damages.)

(c) Was there a causal relation between the work of plaintiffs as employees of Carbide and their physical condition and deaths. (If the answer to issue (a) is "No," issues (b) and (c) will not be reached.)

It was stipulated that defendant was not negligent in the selection of Carbide as the operator of the K–25 Gaseous Diffusion Plant.

AEC is charged with the responsibility of conducting research and development activities in the field of atomic energy in its own facilities under the Atomic Energy Act of 1954, as amended. 42 U.S.C. §§ 2051, 2050.

AEC is the exclusive owner of all production facilities (with certain limited exceptions) for special nuclear materials and is charged with the responsibility for the production of such materials in its production facilities under the Act. 42 U.S.C. § 2061.

■ Negligence and causal relation are prerequisites to recovery under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674. (The pertinent parts of these sections have been quoted.)

■ Liability does not arise against the Government solely by its ownership of an "inherently dangerous commodity" or engaging in an "extra-hazardous activity." Dalehite v. United States, 346 U.S. 15, 44–45, 73 S.Ct. 956, 97 L.Ed. 1427; Strangi v. United States, 211 F.2d 305 (C.A. 5).

■ The Government cannot be charged with negligence of the employees of an independent contractor under the non-delegable rule of local law. United States v. Hull, 195 F.2d 64, 67 (C.A. 1); Hopson v. United States, 136 F.Supp. 804 (D.C.W.D.Ark.); Pierce v. United States, D.C., 142 F.Supp. 721, affirmed in 6 Cir., 235 F.2d 466.

■ An employer ordinarily is not liable for injuries resulting from the performance of work given over by him to an independent contractor unless the work was unlawful itself or the injury was a necessary consequence of executing the work in the manner provided for in the contract, or subsequently prescribed by the employer, or was caused by the violation of some absolute non-delegable duty which the employer was bound at his peril to discharge, or was due to some specific negligence of the employer himself. International Harvester Co. v. Sartain, 32 Tenn.App. 425, 451, 222 S.W.2d 854. One exception to the rule is that if the location and condition and the nature of the work to be done are such that in the natural course of things mischievous consequences may be expected to arise unless means are adopted by which such consequences may be prevented the owner is under the non-delegable duty to see that appropriate preventative measures are adopted. Another exception is where the work is intrinsically dangerous and the performance of the contract would probably result in injury to third persons or the public. Ibid, 32 Tenn.App. 451, 452, 456, 222 S.W.2d 854.

■ Under the Tennessee rule, an owner of property is required to use reasonable care to provide a safe place for an independent contractor and his employees to work. Shell Oil Co. v. Blanks, 46 Tenn.App. 539, 330 S.W.2d 569 (1959).

■ If the owner retains general control of his premises, an employee of an independent contractor who performs work on the premises is an invitee and the owner owes him the duty of exercising reasonable care to have the premises in a reasonably safe condition for use in a manner consistent with the purpose of the invitation. The duty requiring the owner to keep the premises reasonably safe for a contractor and his employees does not apply where the work itself is of an unsafe nature. Muriel M. Pierce

v. Beaunit Mills, Inc., Tenn. Court of Appeals, unpublished opinion.

 The burden of proving which of the causes created the disease or injury is upon plaintiff where there are a number of causes for such disease or injury. Willis et al. v. Heath, 21 Tenn.App. 179, 107 S.W.2d 228.

We proceed to briefly summarize the testimony of the witnesses with these general rules in mind.

### Summary of Testimony of Each Witness

*Wilson Beckham* started to work for Carbide July 16, 1945 and worked continuously until terminated July 5, 1960. He was suffering with Hodgkin's disease at the time of termination. He was a chemical operator at K–25 and worked at the top of the cascades—that is where the final product is made—in 1954, 1955, 1956 and 1957. He wore coveralls and shoes and gas masks at times, but the gas masks were obsolete and worn out. He could smell gas through the mask. Geiger counters were used in the area where he worked to test for contamination. Geiger counters showed his clothing was "hot" at times and that his shoes were hot. One day his shoes were so hot that he could not decontaminate them below tolerance point. Monitors [6] in the area sounded off frequently—two or three times an hour—which was a sign that radiation was in the area. He took urinalysis tests and was advised on occasions that uranium was in his urine. Radiation exceeded tolerance on Geiger counter many times. Each time he had to go to pipe gallery it was hot. Geiger counters showed that his hands were radioactive many times. He was not required to wear film (or radiation) badges [7] in K–27. Blood tests were run once a year. He took a blood test in March, 1960 when he had lost about eighteen pounds of weight. He was dizzy

a couple of times from gas, and his throat was dry as a bone, but eyes not affected. Evacuation of the building where he worked occurred four or five times because of release of radiation.

Beckham had an acrid, dry feeling in his throat when he breathed gas. He was exposed to Alpha and Beta radiation. Phosgene gas was the cause for withdrawals from the building on occasions. It was a whitish color. He does not know the amount of dosage [8] of gas that he received, but knows that he was "hot" several times. Alarms were provided to notify employees when radiation was in the air, but the going off of an alarm did not necessarily mean that there was too much radiation in the air as the alarms sometimes would go off when valves were bad or something went wrong.

A white cloud or other visible substance would cause an evacuation of the plant. An urinalysis test would be made when any question arose as to whether any employee had received too much gas. When a spill came, the product was all over the place. It was when Beckham was sent over to K–27 to clean up a spill that his shoes became so hot he had to get rid of them. When he first started to work the employees wore their own clothes, but thereafter utility men were furnished working clothes by Carbide.

*H. T. Mahoney,* now fifty-three years of age, worked for Carbide from June 21, 1951 until March 10, 1961 as a general maintenance repairman in K–25. Any time compressors or converters failed or a pipe was replaced, there was gas in them. He used dust respirators and gas masks in pipe replacement. Dust respirators were discontinued about 1959. Gas masks were used the entire time he worked. A new type of gas mask was issued about 1959, at which time each employee became responsible for his own

---

6. Monitoring instruments are used for the detection and measurement of ionizing radiation.

7. A film badge is a pack of photographic film used for measurement of radiation

exposure for personnel monitoring purposes.

8. The dose rate is the radiation dose delivered at the point of interest per unit time. A dosimeter is an instrument which measures radiation dose.

mask. He could tell when gas came through masks. The new type mask was cleaned after each exposure. The old masks were carried on supply wagons and many times they would be placed on the floor. He was subjected to gas in changing of cells or when a line was broken unexpectedly. This would occur possibly one time each month. He heard monitor alarms at various times and the employees would evacuate the building.

Mahoney saw Beckham and Pierce exposed to gas many times. He could see gas escaping, similar to steam and smoke, when a line broke. He and Pierce were working on an occasion of an explosion when a welder cut into a line. After that he choked down on the job. Pierce got out before he did. Mahoney inhaled some of the gas which caused him to cough violently and he was finally overcome when Pierce took him out of the area. Three days later a blister burst in his lungs and he hemorrhaged. He was hospitalized three days in May, 1957. While working on a pump in Building 1420, the alarms went on and the pump went out and he was exposed to radiation but felt no ill effects. It was a penetrating radiation. On another occasion, a compressor was melted by a critical mass. The spill was on the floor. He was required to move the compressor and was exposed to gas. On another occasion in Building 1131 while removing a worm screw in the ash pit, Mahoney was exposed to gas. He thinks this occurred in 1959 or 1960. His hands showed Alpha radiation when checked. He was given urinalysis checks from time to time. At the time of the spill of gas, he was not given an urinalysis test although he reported the spill to his foreman, J. M. Davis. He was again subjected to radiation while working on sheet metal sometime in 1960.

Mahoney entered the hospital the first of 1957 and again in December, 1957. In April, 1959, it was discovered that he had leukemia. At the time he was exposed to radiation while working on the pump, he was wearing a radiation badge which was checked. He was not called in for an examination after the badge was checked. Film badges were not issued to maintenance men prior to 1958 except on special occasions.

Mahoney's third excessive exposure to radiation occurred while he was removing a worm screw in Building 1131 and Murphy was working with him. The exposure occurred on a night shift. He was not wearing a film badge on this occasion. At that time, health physicists roped off the area and stated that the job was too hot for an employee to be present over five minutes. Kelly was the physicist who roped the place off and made the announcement. [Kelly denied that this occurred.] Mahoney couldn't tell that he was hurt at that time. Kelly made a radiation test in the area while Mahoney was changing the screw. Kelly was an employee of Carbide.

The gas that Mahoney inhaled was a copper-yellow color. He was subjected to process gas almost daily. He has never felt good after he went to the hospital in May of 1957 for an overdose of gas. When he returned to the hospital in December, his condition was diagnosed as pneumonia. He was not wearing a film badge when he was exposed to gas in May, 1957.

The employees of Carbide were led to believe that they were safe in the absence of an accident. At times there were 600 men in the maintenance department, about 150 to 250 of them were doing the same kind of work as Mahoney and subjected to the same exposures.

When a cell change was done, a chain of smoke could be observed. Mahoney thinks that he was harmed by the gas because of his lung trouble and loss of health. He always had a respirator or gas mask.

Urinalysis tests are used as a check on Alpha radiation which will not go through the skin. All of his foremen and supervisors were employed by Carbide.

A critical mass is a reaction to uranium and is said to occur when enough heat is generated to cause a compressor to burn out. Critical masses occurred in

the Oak Ridge plant in 1956 or 1957. Crystal material could be seen almost every time a cell was removed.

It took about three hours to remove a compressor or converter and during this time a mask would be worn. Mahoney was told that the amount of radiation he was receiving was harmless. He was never told that the area in which he was working was radioactive. When a pipe was cut, a cloud of smoke would last as long as three hours.

Mahoney continued to work in radiation after he developed lung trouble, but the AEC never told him not to do so. He worked for Carbide, but all of the equipment where he worked was owned by the Government. He observed AEC personnel making inspection tours around the plant from time to time.

*Daniel B. Martin* worked for Carbide at K-25 beginning in April, 1951 and continued until September, 1962 as a maintenance mechanic. He, Mahoney and Pierce were in the same crew. He was subjected to uranium hexafluoride gas in cell changes almost every week. He used a gas mask. At times he smelled gas and his throat burned. He remembered the time that Mahoney and Pierce were exposed to gas. He looked around and saw a lot of smoke and gas in the building. Sometimes he would have to adjust his mask and sometimes he would not. There was no process gas (it was stipulated that uranium hexafluoride was sometimes referred to as process gas) in freon lines.

Martin was present when an incident occurred in 1957 involving a freon line when the gas escaped from the system onto Mahoney and Pierce. He heard Mahoney was sick after the occurrence. Freon gas is used as a cooling device.

*Floyd Brown* worked for Carbide from 1951 to 1961 as a maintenance mechanic and also worked with Mahoney and Pierce. He was subjected to process gas a number of times. This would occur when going into the piping system. He

was told to use a mask when going into the system, but it was not necsesary to use it after getting into the system. He would get gas in his mask and use it without cleaning. When air comes into contact with process gas, a deposit is formed. He had a fungus infection in his right lung in 1956 and his physician advised him not to work around nuclear radiation. When he saw smoke he wore his gas mask.

Physicists would make tests in the radiation area [9] but would not give the employees the result of the tests. Some of Brown's badges showed excessive exposure. He had five or six recalls for urinalysis tests. His urine always cleared up after retests.

Other workers would be exposed to gas when cutting into pipes. At times Martin received gas when he did not have mask on. Respirator with cannister in it was used to protect against chemicals and dust. It is a good piece of equipment. He was told to wear mask when going into the system and after getting into the system to use respirator for protection against gas. The workers became negligent at times in the use of masks and respirators. Supervisors would rush work beyond safety limits of time. When a job had to be done and it would take from eleven to twelve hours to do it, Bishop, a supervisor, would insist that it be finished in an eight-hour shift.

*Mrs. Ruby Pierce* is the widow of Howard Pierce, and is one of the plaintiffs. Howard died January 13, 1961 at forty-one years of age. He worked ten years for Carbide and was in good health at the time he commenced. He would take urine samples to the defendant over the weekends.

*George Thomas* worked for Carbide from July, 1951 to June 27, 1961 in the maintenance department with Pierce and Mahoney. He was subjected to process gas while working on cell changes. He worked on the job several times when not

9. The radiation zone is an area where control measures allow dose rates above that which would produce the maximum permissible exposure of an individual inhabiting the area for a full eight-hour shift.

furnished gas mask. He filed several grievances with the Union because of work conditions. He wore gas masks as long as twelve hours at a time. He has a claim against Carbide for permanent total disability. He had not been injured by exposure to radiation, but gas would come through gas mask. He was called for rechecks two or three times on urinalysis tests.

*Doctor Jack Adams* is a Chattanooga pathologist. He examined Beckham April 20, 1960 and found him suffering with a lymph node disease of the Hodgkin's type. He excreted some Alpha particles. The doctor doesn't know the cause of Hodgkin's disease. He is not aware of any proof that radiation causes Hodgkin's disease.

*John C. Bates* is President of the Oil, Chemical and Atomic Workers Local 2388. He received complaints from time to time from employees of Carbide that masks and respirators were not satisfactory. Also, he had numerous complaints that the plant was not being operated in a safe manner. The complaints of employees about respirators were continuous. The complaints were discussed with the Government from time to time, as shown from minutes of meetings covering the period from July 13, 1957 to September 13, 1962.

Bates had complaints from employees that radiation hazards existed in the plant. On October 18, 1962, Union representative charged that certain areas in the plant were highly contaminated. On December 12, 1962, some of the shoes of the employees were found to be contaminated above allowable limits. There were few complaints of lung difficulties because of radiation. There were many complaints of lack of protective devices to the employees who worked in the plant. Specific complaints were made to AEC about respirators and an AEC representative stated that respirators protected against process gas.

*Mrs. Maymie Lou Beckham* is the widow of Howard Beckham who died on April 24, 1962 at the age of forty-six. His face would peel while on the job as though he had been burned. He complained of throat soreness and being sick at his stomach and nausea. Mrs. Beckham works for Carbide at the Oak Ridge plant.

*Newton I. Sax* is a health physicist and toxicologist. He was Assistant Chief of Health and Safety Laboratory of the Atomic Energy Commission in New York from 1952 to 1958. He stated that Alpha radiation does not penetrate [10] through the skin, but Beta and Gamma radiation will penetrate [11] even through iron pipes, although Beta rays, when coming into contact with metal will emit Gamma rays outside the pipe.

Uranium hexafluoride is a gaseous material which can be inhaled as a gas and get into the blood stream and lodge in the bones. When hexafluoride hydrolyzes, it creates smoke which can be seen. If men cut into pipes and gas comes out, the respirators would not keep Alpha particles from getting into their lungs. Army assault masks are much more efficient than respirators. Army assault masks are 90 to 95 per cent effective and respirators give about 50 per cent protection. A respirator is an emergency type device. An air line respirator is the best protection.

If employees' eyes were burned and their faces became red and peeled off, such conditions were caused by hydrogen fluoride in masks, but this has nothing to do with radiation.

Urinary analytical data on Mahoney, Pierce and Beckham indicate that they were subjected to Alpha radiation, but the data doesn't indicate how much radiation they received.

Alpha particles are more damaging because they remain in the body and are more penetrative and toxic and deposit

---

10. For radiation normally encountered in the atomic energy industry, alpha particles, beta particles, and some very weak x-rays are considered as non-penetrating.

11. For types of radiation normally encountered in the atomic energy industry, penetrating radiation includes gamma rays, neutron radiation, and most x-rays.

so much energy in such a small space. When hydrolysis takes place and there is dust in the air, this dust is contaminated with Alpha particles. Moist cloths should be used to wipe up the dust in the plant or a special vacuum cleaner should be used rather than a broom.

Uranium hexafluoride is a heavy gas and not easily disbursed. Sax knows of no study that correlates either lymphatic leukemia or Hodgkin's disease with radiation. He believes there is a causal relationship in radiation exposure and leukemia. In his opinion, this is the only scientific explanation for leukemia. Radiation is the only known cause of leukemia.

*Doctor Beryl M. Oser* specializes in internal medicine and teaches at Ohio State University. He examined Mahoney on May 13, 1963 and found him suffering with lymphatic leukemia. Hodgkin's disease and lymphatic leukemia are interrelated and many times cannot be differentiated medically. The amount of radiation doesn't make any difference with respect to age, sex and vulnerability at the time of exposure. A body cell may be altered or killed by radiation. Leukemia can be caused by radiation. Radiation is the only known cause of leukemia. A specific dose is not required to cause leukemia or Hodgkin's disease. Constant subjection to radiation will aggravate, accelerate or precipitate leukemia. Urinalysis reports of Pierce, Beckham and Mahoney show that they were subjected to Alpha radiation. Mahoney's breathing of Alpha rays caused his leukemia; Beckham's subjection to small amounts of Alpha radiation caused his Hodgkin's disease; and Pierce's inhalation of small particles of Alpha rays caused his granulocytic leukemia. Employees who have lung trouble should be watched carefully and it is dangerous for them to work at K–25. Susceptibility to radiation is important.

Doctor Oser knows of no report that correlates lymphatic leukemia with radiation.

*John W. Bishop* is maintenance supervisor in the Gaseous Diffusion Department and supervises welders and maintenance mechanics. Floyd Brown worked for him three or four years but he has been terminated. He never ordered Brown to work when he did not have the prescribed safety equipment. The respirators used were satisfactory. The biggest complaint about the respirators was that the employees had to clean them. Employees never complained that respirators were not protecting them. Brown complained all the time about something. He was a chronic complainer. Proper equipment was always available—gas masks, respirators, rubber suits, boots, coveralls, safety goggles, face shields and various types of gloves. Gas masks, respirators, gloves and glasses were used from day to day. A large portion of the work required respirators. If a man started to work without safety equipment, he was ordered to get it. Safety came first. Thirty minutes was the longest time any man who worked for him wore a gas mask. Bishop has never worked in cell changes. He has seen dust in plant. Sponges are used to clean up dust in the plants, as well as vacuum cleaners. Bishop doesn't know whether any of the dust and debris found in the buildings was radioactive. He always wore a gas mask when system broke open and never had any sensations in eyes and throat. Many times when system is opened, gas masks are not necessary.

None of the metal Bishop worked on showed radioactivity. He was told that there was no danger of radiation when protective devices were used. Plant safety rules were posted in the plant. The building was cleaned before the employees started on a job. Health physicists were around making checks frequently.

*James Kelly* was employed by Carbide on January 1, 1951 and worked until June 2, 1961 and was in the health physics department the last years that he worked. He was familiar with the ash pit in Building 1131 but he did not place any limitation in connection with the work there as testified to by Mahoney. If he found any degree of contamination from his tests he would report his find-

ings to his supervisor. Mahoney never requested him to check job in Building 1131. Kelly took a health training course for six months. AEC representatives inspected plant from time to time. He observed dust particles in the plant and spread on the equipment and they would show contamination when tested.

Kelly found Beta radiation in the plants. He found Beta radiation around the flanges when they were cutting into the system. The Beta radiation is measured in millirems. He found as high as 500 millirems in the ash pit in Building 1131 but did not rope it off. Alpha radiation is measured by counts. He secured as high a count as 12,500 per minute in a dust fallout. He didn't check while men were working and never told any employee about any high reading. Gamma radiation is also measured in millirems. Kelly would get counts of 25 millirems or less on certain occasions. He found Gamma radiation after pipe had been removed out of system. He has observed fallouts in Buildings 1131, 1140, 1410, K–29 and K–31 and observed dust in these buildings. He found as much Beta radiation in Building 1131 as in any other building. He has found 12,500 counts of Alpha radiation in Building 1131, this occurred when there was a fallout. Dust was seen on coveralls, shoes and hands of employees. Employees were required to wear dust respirators or masks.

*Sanders Hughes Jones* has worked for Carbide since December 4, 1944. He worked as a chemical operator for six months in the maintenance seal service. He was a maintenance mechanic until 1952 and became a supervisor in the maintenance department at that time, and has continued to work in that capacity. He has about seven to twelve men in his crew. He is a first line supervisor.

Mahoney worked for Jones in 1955 and 1956, rigging and pipefitting and on cell change jobs. Pierce was in his crew from 1958 through 1961 doing about the same thing as Mahoney, except Pierce worked in another building. Operations group gives go sign before Jones' group could cut into a system for a cell change. Safety equipment fans are moved in before starting to work on the system. Work area is usually in good condition. Cascade service decontaminates pipes before Jones' group starts to work on them. Safety standards have been established and are to be followed by the workers.

The men have individual respirators. Safety equipment is always available and the employees are required to use the safety equipment. Jones has told employees to put on safety equipment.

Process gas smoke does not always come out when pipes are cut. There are thirty-two cuts in changing a complete cell in the process gas system. When cutting is first started, the pressure is great and there is usually some smoke. Men are required to use respirators when cut is being made.

Eighteen to twenty-five welders are used in making a complete cell change. Torch and electrical welders make smoke. Cells have been changed without smoke. Masks and respirators are used in making the change. Routine checks are made for contamination. Not every cutting job is checked. Safety meetings are held frequently. Janitors sweep up the floor.

Many metals are found when pipe is cut and these materials are taken to hot salvage yard. Sanders Jones doesn't understand that the salvage is highly contaminated.

There are traps of gas in the whole system. During normal release of gas respirators are used. There are times when masks are worn most of the day. The men didn't know what radiation they were working in. Respirator was put on when gas was smelled. He had seen some of his men with rash, who were sent to the dispensary.

*Kenneth M. Jones* has worked for Carbide since August 13, 1944. He worked in K–25 as a mechanical engineer. He was superintendent in charge of cascade operations.

The cascade process is done in a large building. Five or six units make up cascade process. K–25 contains 39.8

acres about one mile long and 350 feet wide. Cascade system is a sealed system. There is some degree of radiation inside the system.

Beckham worked as an operator in cascade system, recording data pertaining to gauges, etc., and checking mechanical parts of the equipment to see that it was actually running. Beckham was assigned to product withdrawal operation. During the process of disconnecting cylinder, there can be leakage. The operators in cascade have been instructed to wear protective devices when leakage occurs—they have monitors to detect leakage.

If safety devices are used, there is no danger from radiation. Instruments are used to determine a critical mass has not accumulated. A monitor is located in the immediate area adjacent to convertor and compressor. Cell removal is a major operation. Operation Department is responsible for preparing equipment for mechanics or maintenance. Cell is purged from gas. In spite of everything that can be done, there will be pockets of gas when pipes are cut into, but the amount is only a nuisance which the respirator will protect against. Forty or sixty cuts are made in the pipe line when a complete cell removal occurs, but gas is not found in all of the cuts. The employees' safety equipment is being improved all the time. Many improvements have come about since the inception of the operations.

Kenneth Jones knows of no safer or better way to operate the plant than used by Carbide.

Freon gas is used as a cooler to remove heat from the compressors. Generally it does not come in contact with the process gas unless there is a leak.

Cascade system operates below atmosphere. There has never been a criticality in the plant.

Kenneth Jones has smelled gas with and without a gas mask. When he hears of a release, he goes to the place of the release and if he smelled gas he would put on his mask. He has removed pipes on a few occasions because of Beta or Gamma radiation. Employees do not have clothes to protect against radiation because the amount involved would do no injury. Alpha radiation release occurs about once a week.

In 1955 and 1956, AEC made change of equipment which took two days to a week to complete and there were releases of gas during the change-over period. Pockets of gas may be found anywhere in the system during cuts involving the removal. Dust does not settle in the cascade facilities. Purging of the system will protect completely against gas. There is no need for direct air system to protect against gas. Exhaust system would be impossible.

AEC makes inspections of the plants. It owns the safety equipment. AEC makes criticisms of safety standards used by Carbide and makes checks of equipment being used. Area in K–25 was roped off occasionally because of releases of gas. There is no danger in sweeping up dust or using vacuum cleaner in removing dust in the plants. There are a few airline suits in the building. There is no need for impermeable suit that has direct contact with outside air. The time suits are furnished is when there is a leakage that has not been valved off—also to protect against gas damage to eyes. These suits would completely protect against breathing impure air. Kenneth Jones has had complaints about respirators being knocked off and not being adequate to protect against gas. There have been several releases of gas from cell changes. Carbide has complained of number of releases and information about them has been furnished to AEC. AEC sets the basic safety standards. Kenneth Jones remembers the spilling of uranium hexafluoride when Beckham helped clear up the mess. Alpha radiation was involved.

Beckham's shoes became contaminated to the extent that they would not be decontaminated. There were complaints from employees that old and new types of respirators were uncomfortable. Beck-

ham worked in area where contaminated air existed.

*R. H. Wagner,* a plant engineer for Carbide, prepared detailed data from records of the Company and of the Government concerning the ventilation systems in K-25, K-33, K-29, K-27, K-31 and K-1131 buildings.

*Albert F. Becher* is head of the Safety and Health-Physics Department for the Gaseous Diffusion Plant at Oak Ridge. He began as an employee with Union Carbide in 1944 and his job is to develop a program to protect the health of the employees of the K-25 plant. The Manhattan District set up a safety committee at K-25 in 1943. Bulletins issued. University of Rochester tested the gas masks and respirators that were used. In 1944, another committee was formed that worked closely with Rosen Committee. Gas suits were designed to protect against a release of poisonous acids and they are rarely needed for more than 20 minutes at a time. The Safety Committee inaugurated a program in 1945 of developing a monitoring system which was known as the hygiene group.

Cascade service group was started in 1946 to protect against radiation. In 1946, Carbide began to educate operators. Conferences were held on Alpha radiation for supervisors and an all out effort was made to acquaint every employee with the effects of radiation. Conferences were had with staff supervisors. In 1953, safety and health physics were merged. Two years training was given to supervisors. Carbide turned to recommendations of International Committee on Radiation Protection, National Committee on Radiation Protection and Federal Radiation Council to determine how much radiation the human body could stand. These committees recommended standards of exposure for man. The standards have been adjusted. Carbide in its operation has adopted these standards. Carbide's employees in the Oak Ridge plants have reached only a fraction of the levels of radiation set by these committees.

Data was furnished to Dr. Hursh on all the employees who worked with plaintiff Mahoney, which included data on Pierce and Beckham.

Beckham was exposed to three separate radiation releases. Mahoney and Pierce were not exposed to any releases.

Film badges are used to detect Beta and Gamma radiation. The monitoring system, also used to detect radiation, was started in 1955. Health physicists make periodic visits around the plants to measure radiation exposure. The clothes and cigarettes of those who smoke have been tested to see if particles came off of these items and tests have shown that the radiation found was below permissible limits.

The respirator was thoroughly tested before being adopted. Respirators are distributed on a personal basis and each employee has to keep his respirator clean. Suits are not supplied to employees with air devices connected with outside air because they are not necessary. Mechanics could not wear such suits with safety. Air supply equipment would not work at all. Respirator has no relation to emergency. Gas masks are used for face protection and cannisters in them protect against various acids and gases. Gas masks are used when uranium hexafluoride gas is released. Mask does not supply its own air.

AEC required Carbide to follow certain safety standards, one of which provides that if an employee exceeds one-half of body permissible limits of radiation in six months, a report must be made of that fact to the Commission. AEC checks the plant and makes an annual audit of the health physics programs that are followed.

Material releases were reported to AEC when loss exceeded $5,000.00. There was only one loss in excess of that sum. Becher helped clean up the building after this release. A ton of uranium was dumped on this occasion.

Ten per cent of permissible limits of radiation is considered significant. If a

person received 10% of permissible limits of radiation, he was given a dose record. Sometimes a person is allergic to rubber and this causes a rash. Plastic suits should be used where there is a heavy concentration of process gas, but they are not used in K–25 because it is not necessary. The measurements of the releases show that they were of nuisance amounts of process gas. The suits that would be 100% efficient would weigh about fifteen pounds and an employee could not get into the cell wearing such a suit. An air hose cannot be dragged in and out of a cell. Wearing an air line gas mask would be more dangerous than the gas. New respirators were put in use in March, 1958 and the old ones were about 97% efficient.

Cascade workers are not badged because they are not supposed to be exposed to radiation. Total contamination area is about one-half of what it used to be. About 6% of entire area was contaminated, now about 3% of the area is contaminated. Tests showed that Alpha, Beta and Gamma particles were infinitesimal as to plaintiffs.

*Doctor John Bachman Hursh* is a health physicist of Rochester, Minnesota. He evaluated the statistical data of Mahoney, Beckham and Pierce, including the plant medical records. He was furnished work history of plaintiff Mahoney, including film badges. All urine data were furnished him of employees who worked in the capacity that Mahoney worked. He was also furnished air environmental data. Identical information was furnished with respect to Pierce and Beckham.

Tests showed that Mahoney received only 2.2 rems of Alpha radiation over a ten year period, Pierce received a total dose of 2.6 rems over a period of nine years and Beckham 4.06 rems over a period of fifteen years.

None of plaintiffs received appreciable doses of radiation. A sufficient amount of radiation may cause cancer, but none of the claimants received a sufficient amount to cause cancer.

*Doctor Carl U. Dernehl* is a physician who specializes in industrial medicine and works for Carbide in New York as Assistant Director. Death from leukemia in the United States is at the rate of 6.44 per 100,000, death from leukemia in Tennessee is at the rate of 6 per 100,000 and death from leukemia of employees in AEC plants operated by Carbide, which includes K–25 plant, is at the rate of 2.1 per 100,000.

*Doctor William C. Moloney* is a physician who is clinical professor of medicine at Tufts University; Director of the Laboratories at Boston City Hospital; and Chief of the Third Tufts Medical Service at the City Hospital. He has authored seventy-six public papers on radiation and helped prepare the Japanese reports in regard to injuries suffered in the Hiroshima and Nagasaki bomb explosions. He worked on injuries caused by bomb fallouts in the Marshall Islands. He worked at Oak Ridge in 1954.

Doctor Moloney was of the opinion that there is no connection between exposure to radiation and Hodgkin's disease. No relation between Hodgkin's disease and radiation was found from the Japanese study. Exposure of the Japanese people to under 100 rads [12] of radiation did not affect them. 300 or 400 rads is a very large dose, but there is no evidence of increase of Hodgkin's disease in any of the people who were exposed to these high doses.

A person exposed to 2.2 rems [13] of radiation would not develop chronic lym-

12. Rad: A unit intended to extend the definition of the roentgen (The standard unit used by radiologists and abbreviated as r. It is a measure of the quantity of absorbed radiation as defined by the amount of ionization produced under specified conditions.) to apply to all types of radiation. Technically, it is the absorption of 100 ergs of energy per gram. It is a measure of the energy imparted to matter by ionizing particles per unit mass of irradiated material at the place of interest.

13. Rem: Roentgen equivalent man, a dose unit which equals the dose in rads multi-

phatic leukemia. He does not believe that Pierce's exposure to 2.6 rems of radiation over a period of nine years caused his granulocytic leukemia. He is of the opinion that a person would have to be exposed to at least 100 rads of radiation over a nine year period before a causal relation between acute granulocytic leukemia and his exposure could be established. Radiation does not aggravate leukemia. People who have leukemia are treated by radiation. There are different degrees of tolerance in radiation. There is nothing to support the theory that one person may be hurt from a low dose of radiation and another person would not be hurt from such dose.

Radiation produces types of cancer that are normally found in any type of population. Sufficient radiation can cause cancer to the cells even though it would take a larger dose to cause injury to the body as a whole. A sufficient amount of Alpha radiation passing through the blood stream may kill or damage the cells by ionized radiation. Hodgkin's disease does not come from radiation. Its cause is unknown.

*Doctor Leonard Hamilton* does research in cancer at the Sloan-Kettering Institute for Cancer Research in New York. He has made a special study of ionizing radiation [14] and blood disease. Also, a special study of radioactive isotopes and a special study of lymph nodes. He prepared annex D to the United Nations report with regard to radiation. He is connected with Memorial Hospital in New York, where many cases of leukemia are treated from year to year.

Exposure to 4.06 rems of radiation over a period of fifteen years would not cause Hodgkin's disease. There is no evidence that radiation has ever caused Hodgkin's disease. Exposure to 2.2 rems of radiation over a period of ten years does not cause chronic lymphatic leukemia. There is no evidence that radiation induces chronic lymphatic leukemia.

Exposure to 2.6 rems of radiation over a period of nine years will not cause granulocytic leukemia.

The Japanese study indicates that leukemia does not result in doses of less than 100 rems. If it is assumed that there is any validity in the linear theory (Linear theory assumes that small repeated doses cause cancer and threshhold theory assumes that doses must be at least 100 rems to cause cancer) there is one chance out of twenty-four that Pierce's acute granulocytic leukemia resulted from radiation.

Doctor Hamilton was of the opinion that Pierce was not exposed to a sufficient amount of radiation to cause acute granulocytic leukemia. The cause of Hodgkin's disease is unknown. Radiation could cause Hodgkin's disease, but there is no evidence that it does. Some individuals may be two times as sensitive to radiation as others. A sufficient amount of radiation will cause cancer.

*Doctor Charles S. Shoup* has been employed by AEC at Oak Ridge since 1950 as Chief of Biology. Health protection is of primary importance with AEC. Primary responsibility for health is on Carbide. AEC prescribes the health standards to be followed by Carbide in its operations. A special safety department has been established by AEC. Health standards of AEC are passed on to the contractors. Permissible limits of exposure to radiation are established. AEC works in close contact with contractors in health protection. AEC assures workers that best health policies are carried out.

In 1950, AEC carried out health policies by visits to plants. It served as contact between contractors and Washington Health Service of AEC. AEC in Washington now requires that information obtained from contractors be documented. Health reports are discussed with top management. AEC evaluated the medical and training programs of contractors. It checked contractors to see whether

plied by the appropriate value of RBE (Relative biological effectiveness) for the particular radiation.

14. Ionizing radiation is any radiation of energy sufficient to produce ions, directly or indirectly, in its passage through matter.

they were complying with permissible limits of exposure. AEC is in the plants on a weekly basis and if anything demands attention its representatives go to the plant each day. If AEC sees something hazardous, it is taken up with management of Union Carbide. The function of AEC is to advise with management. Carbide has a strong health and safety program. Carbide is complying with health standards at K–25. The number of men that has been employed at K–25 plant is something over 31,000. Nearly 100,000 man years were worked. Four cases of leukemia were reported as having originated in K–25. Two involved plant workers and two involved clerical or store workers.

It is believed that the lymphocytes are more susceptible to radiation than other parts of the body. Surface contamination creates a problem. The problem arises when contamination is stirred in the atmosphere and persons breathe the radioactive particles. The only way the amount of radiation a person is breathing may be determined is to monitor the air. Dr. Shoup has not received any reports that employees of Carbide at Oak Ridge were exceeding the permissible limits of radiation. AEC does not tell doctors what to do. Dr. Shoup attended the Union meeting of April 25, 1961 at which health and safety matters were discussed. One question discussed was that operators were going to be laid off and this would create a health problem. Union did not complain in that meeting about what Carbide had done in the past with respect to health problems. It complained about operators not getting certain data and that the buildings were not being kept clean. Also that training had been reduced. No complaints were made about gas masks or respirators.

*Willis Hay* is Director of Personnel for AEC. He also attended the Union meeting of April 25, 1961 when Mr. Bates of the Union and Mr. Roth of AEC were present. The purpose of the meeting was to discuss health safety problems. The Union took the position that old health conditions were satisfactory but that those conditions had been changed because of layoffs causing health protection to become inadequate.

Employees have been changed from their work because of too much radiation, but such changes did not involve either of the three plaintiffs. When Beckham was near a release, he was immediately sent for urinalysis test.

*Robert E. McMillan* has worked eighteen years for Carbide and has engaged in decontamination work. He knew Pierce and Mahoney, but didn't know Beckham. He worked around places where Mahoney and Pierce worked. 12,500 counts per minute were obtained from areas where dust had settled in the areas and at time of oxidation of gas.

*Paul Hurst* is a chemical operator for Carbide at K–25. Brooms were used to sweep dust from the floor of the plant. He has been in several releases. He wasn't given an urinalysis test after a release of radiation. Very seldom were health physicists present when releases occurred. Measuring equipment would be set up after the danger was over.

*Charles Thigpen* is head of the Department of Statistics at the University of Tennessee. He made certain statistical calculations from hypothetical facts.

AEC's answers to interrogatories show that it does not attempt to control and direct any medical doctors in the performance of their professional duties, but exercises control over the dispensary and medical facilities. It audits and inspects the facilities to determine adequacy of the industrial health program in accordance with AEC standards. AEC also inspects the facilities with respect to standards.

### Discussion

Plaintiffs contend that the amount of the dose [15] is unimportant in evaluating

---

15. External dose is a dose due to radiation originating outside the body. Internal dose is dose due to radiation originating within the body; e.g., from ingested or inhaled radionuclides.

injuries caused by radiation. This contention was supported by the testimony of Dr. Oser, who was of the opinion that dosage could only affect an individual according to his own susceptibility and vulnerability. Doctor Oser could not give any report that correlated Hodgkin's disease with radiation; nor, could he establish permissible levels for human exposure to radiation. He stated that a human being's susceptibility or vulnerability to radiation could not be measured. He did not know the amount of the dose that any of the plaintiffs received throughout their work period for Carbide. He was of the opinion that exposure to 2 rads of Alpha radiation over a ten year period could cause leukemia.

Doctor Sax, who like Dr. Oser, testified as plaintiffs' witness, disagreed with Dr. Oser on the question of whether the amount of dose of radiation was important in evaluating injuries caused to human beings. He was of the opinion that the amount of the dose was important. He knew of no specific worker having been injured while working within the permissible limits fixed by the I.C.R.P.[16] and the N.C.R.P.[17] He did not know of any specific study groups on radiation that correlated chronic lymphatic leukemia or Hodgkin's disease with radiation exposure.

Doctor Moloney stated that there was no evidence from the Japanese tests and the Spondolytic English tests that a dose under 100 rads caused leukemia. He was of the opinion that the exposures of plaintiffs to radiation were not sufficient to cause either chronic or acute lymphatic leukemia or acute or chronic granulocytic leukemia, or Hodgkin's disease. He stated that radiation did not aggravate leukemia.

Doctor Hamilton was of the opinion that the doses of radiation to which plaintiffs were exposed were not sufficient to

cause any of plaintiffs' disabilities. He stated that if the so-called linear theory should be adopted in the Pierce case that the odds were 24 to 1 that Mr. Pierce contracted the acute granulocytic leukemia from natural causes rather than from radiation. He was of the opinion that radiation did not cause Mr. Pierce's disability and death. Neither Dr. Moloney nor Dr. Hamilton believed in the linear theory, i. e., that small amounts of radiation repeated over a period of years could cause leukemia and Hodgkin's disease.

Doctor Hursh calculated the integrated radiation dose of absorbed uranium to each plaintiff. His report shows that Mr. Mahoney's potential exposure was to a soluble form of uranium. In Carbide's normal operation, the system is sealed and the activity in the air is not above normal background levels. But, in the event of cell changes, if the system is not completely purged, small amounts of residual $UF_6$, which is a soluble form of uranium, may hydrolyze and be released as a puff of white smoke in the air. The recommendations of the N.C.R.P. and the I.C.R.P. for maximum permissible air levels of soluble forms of natural uranium [18] are set so as to prove a safe margin between industrial practice and a level which would produce kidney injury caused by the chemical toxicity of uranium. Mr. Mahoney's exposure was to natural and slightly enriched uranium.[19] Doctor Hursh was furnished data on Mr. Mahoney's urinary samples and his fellow workers over many years, including measurements of the uranium content and the number of Alpha disintegrations per minute on each sample. This permitted a calculation as to the specific activity of the material to which workers were habitually exposed. Doctor Hursh was of the opinion that if Mr. Mahoney and his co-workers sus-

16. International Commission on Radiological Protection.

17. National Committee on Radiation Protection.

18. Natural Uranium—naturally occurring uranium—comprised principally of uranium–238 and having 0.71% uranium–235.

19. Enriched Uranium—uranium having a percentage of uranium–235 greater than 0.71%.

tained any injury from radiation particles it would be to the kidneys. If kidney damage did not occur, he was of the view that absorbed uranium would be only a fraction of the radiation levels adjudged safe by the national and international experts. The medical reports of the plant showed that Mr. Mahoney's kidneys functioned normally.

Doctor Hursh made his tests to determine whether or not Mr. Mahoney's work environment and that of his fellow workers carried with it an appreciable risk of over-exposure from absorbed uranium. He examined the urinary measurements of 61 workers who were employed in the same sort of work and the same plant environment as Mr. Mahoney. He dealt with measurements of 1548 urinary samples collected for the ten year period from 1950 through 1959. The radiation risk over the period of Mr. Mahoney's employment was evaluated by using the average of the many urine samples provided by him and his co-workers. The average total dose to each worker in Mr. Mahoney's category over the ten year period is equal to 2.2 rems to the bone. Dr. Hursh felt that the dose to the bone marrow would generally be estimated at one-half to two-thirds of this amount. His report shows that if Mr. Mahoney had lived in parts of Illinois where the radium in drinking water is somewhat higher than Oak Ridge, his yearly dose from natural sources would have been 0.2 rem per year and his 10-year dose from natural sources would equal 2.0 rems. The report also shows that the average per capita dose from diagnostic x-ray in the United States is 0.17 rem per year, or equal to 1.70 rems for a ten-year period.

The average count on 32 urine samples supplied by Mr. Mahoney himself is 0.2 Alpha counts per minute per 100 ml. urine. This amounted to a yearly dose of 0.05 rem or 0.5 rem over a period of ten years. Doctor Hursh was of the opinion that Mr. Mahoney was more careful than the average workman and he consequently absorbed less uranium.

The Hursh report shows that Mr. Pierce was exposed to a soluble uranium compound. His potential exposure was to uranium hexafluoride, which is soluble in body fluids. When inhaled from the air it goes into the lungs and passes rapidly into the blood stream. About two-thirds of the amount inhaled is excreted in the urine within 24 hours. The remainder is temporarily taken into the skeleton and the kidney. Other soft tissues contain very small amounts. The organs which receive the greatest radioactive dose from the soluble compound are the skeleton and the kidney.

Doctor Hursh's report shows that Mr. Pierce worked under conditions similar to Mr. Mahoney. Small amounts of residual uranium hexafluoride may be released as white smoke when a cell is opened and the disconnected part of the system is not purged. When releases occur, the employees affected are sent to the plant dispensary where urine specimens are obtained for analysis. These analyses are listed as supervisory examinations. Mr. Pierce's report from 1952 to 1960 reveals only two supervisory examinations, neither of which showed intake of appreciable amounts of uranium.

His report further shows that Mr. Pierce's exposure was to unenriched and slightly enriched uranium. It would be expected that his exposure would produce kidney damage first as in the case of Mr. Mahoney. If his kidneys were not damaged, it would be reasonable to assume that the radiation caused by absorbed uranium would be only a fraction of that adjudged safe by the aforementioned scientific committees.

Radiation experts are of the opinion that functional disability will not be caused from a dose of radiation not exceeding .3 rem per week for an entire lifetime. The tests show that the radiation dose received by Mr. Pierce during his period of work was negligible. His dose was approximately one-sixtieth of .3 rem per week or 15 rems per year which, as previously indicated, is the permissi-

ble dose for occupational exposure set by the I.C.R.P., N.C.R.P. and National Research Council.

Doctor Hursh's report shows that Mr. Beckham was exposed to soluble uranium compound and that air-born uranium compounds will accumulate in the lungs and the lungs become the organ where damage will occur. One day after the inhalation of soluble uranium compounds, the amount remaining in the lung is negligible. The uranium leaving the lungs enters the blood stream and about two-thirds of this quantity is excreted through the kidneys within twenty-four hours. The remainder is temporarily taken into the skeleton and the kidney. Other soft tissues contain very small amounts, hence the skeleton and the kidney are the organs which receive the largest dose of soluble compound. Mr. Beckham was sent to the dispensary for checks on six occasions when a possibility of exposure existed. He was exposed to a mixture of natural and enriched uranium. If any injury occurred from absorbed natural uranium it would be expected to occur to the kidney. If his kidneys were not injured, the reasonable assumption is that the radiation due to absorbed uranium would be only. a fraction of that adjudged safe by national and international experts.

The report discloses further that the chronic and acute exposures of Mr. Beckham over his fifteen year period of work service amounted to a total of about 4 rems. This was well within the range of radiation which is sustained by the non-industrially exposed population from natural sources in different parts of the world. It was not a contributing factor in the opinion of Dr. Hursh for Mr. Beckham's fatal disease.

### Statistics

Plaintiffs contend that the statistical odds are 10,000 to 1 in favor of the probability that there is causal connection between the radiation to which the plaintiffs were exposed and their resulting disabilities. It is argued that four cases, two of leukemia and two Hodgkin's disease, is a high ratio among 800 employees in the Oak Ridge plants. The 10,000 to 1 figure was used by Dr. Thigpen, a statistical expert from the University of Tennessee. His testimony was used in rebuttal. His conclusion did not take into consideration that some 31,000 individuals worked in the K–25 plant from its beginning to August, 1962 which represented something over 100,-000 man years and that during that period only four cases of leukemia were reported. Two of these cases were production workers and two were clerical workers. The two production workers were Pierce and Mahoney. From 1950 to 1961, there were more than 2,000 and up to 3,700 hourly employees working in the K plant. Hence, a sample of 60, 800 and 12,000 persons who worked in the K plant is not a correct sample to base a conclusion that the chances were 10,000 to 1 that plaintiffs would not have developed leukemia in the absence of radiation.

### Casualness in Enforcement of Safety Practices

■ Carbide, by permitting men to cut into the pipes before purging them of all pockets of gas showed casualness in the enforcement of its safety practices. Proper purging would have eliminated all gas from the pipes that were disconnected from the system. There is evidence that dust was permitted to accumulate in portions of the building which was at various times contaminated to some extent, and which was on occasions swept with brooms. Good practice required the removal of the dust by mops or vacuum cleaners. There is also testimony that numerous complaints were made by employees that the gas masks and respirators were insufficient to protect them from gas. On the basis of their testimony, many of the employees of Carbide were permitted to smell too much gas. This indicated that there was a certain casualness or carelessness that grew up in the plants among the employees and their supervisors in the face of uncertain dangers. But in spite of this claimed laxity in the enforcement of

safety standards, the preponderance of the proof fails to show that plaintiffs' exposures to radiation or toxic gases were sufficient to cause leukemia or Hodgkin's disease. Plaintiffs' exposures were well below the marginal limits for human safety. True, Dr. Oser was of the opinion that plaintiffs' exposures to uranium hexafluoride gas over the periods of time that they worked for Carbide caused their disabilities.

The Court recognizes Dr. Oser's qualifications as a specialist in internal medicine. In weighing his testimony, however, consideration must be given to the fact that he has not done research or made special studies in the field of radiation. Nor has he made special studies of industrial workers who, at times in the performance of their work, are exposed to varying amounts of radiation.

That plaintiffs were not exposed to a sufficient amount of radiation to do bodily harm is established by the testimony of two eminent scientists, men who are working on the frontiers of knowledge, men who have done research and made special studies in radiation, men whose intellectual integrity was patent and who served only the cause of truth and not a partisan viewpoint.

The Court is of the opinion and holds that plaintiffs failed to establish a causal relation between their work for Carbide and their resulting diseases or injuries by a preponderance of the evidence. The Court is further of the opinion and finds that plaintiffs failed to show by a preponderance of the evidence that the Government was guilty of any act of negligence that proximately caused their diseases or injuries. The Court, therefore, concludes that plaintiffs have failed to establish a case of liability against the Government under the Federal Tort Claims Act.

The remaining questions raised by the parties have been considered, but in view of the conclusions reached, it is not deemed necessary to pass upon them.

Present order in conformity with the views here expressed.